**PARK TOWER MANAGEMENT, LTD., Plaintiff,**

v.

**The UNITED STATES, Defendant, and**

**LB & B Associates, Inc., Defendant–Intervenor.**

**No. 05–413C.**

United States Court of Federal Claims.

Aug. 31, 2005.

J. Randolph MacPherson, Halloran & Sage, L.L.P., Washington, D.C., for Plaintiff.

Lindsay E. Williams, United States Department of Justice, Washington, D.C., for Defendant. Ruth Kowarski, United States General Services Administration, Of Counsel.

Benjamin N. Thompson, Wyrick, Robbins, Yates & Ponton, L.L.P., Raleigh, N.C., for Defendant–Intervenor.

## MEMORANDUM OPINION AND FINAL ORDER

BRADEN, Judge.

On March 29, 2005, Park Tower Management, Ltd. ("Park Tower") filed this action in the United States Court of Federal Claims seeking compensatory damages and injunctive relief, following a December 17, 2004 decision of the General Services Administration ("GSA") to award the Daniel Patrick Moynihan United States Courthouse ("Moynihan Courthouse") Mechanical and Elevator Maintenance Service Contract No. GS02P05PLC0191 ("Contract") to LB & B Associates, Inc. ("LB & B").

The United States Court of Appeals for the Federal Circuit repeatedly has held that the "disappointed bidder" faces a "heavy burden" to establish that a procurement award has no "rational bases." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001). That burden is even greater where the procurement is awarded based on the "best value" to the Government. Although the process in this case was not flawless and fair in all respects, the GSA's award decision was rational and did not violate any statute, regulation, or provision of the United States Constitution. Accordingly, as a matter of law, the court is required to grant Defendant's Motion for Judgment on the Administrative Record.

## RELEVANT FACTS [1]

**A. Source Selection Plan For Solicitation GS–02P–00–PLC–0191: GSA's Procurement Of Mechanical And Elevator Maintenance Services For The Daniel Patrick Moynihan United States Courthouse.**

On August 17, 2000, the Assistant Building Manager for the Moynihan Courthouse requested that GSA commence a Solicitation for certain mechanical/elevator services. *See* AR at 1. On November 27, 2000, GSA issued Solicitation GS–02P–00–PLC–0191's Source Selection Plan ("SSP") that set the forth award criteria and designated a Source Selection Authority ("SSA"), Contracting Officer, and seven member Source Selection Evaluation Board ("SSEB")[2] to evaluate responsive proposals. *Id.* at 3, 27.

The SSA was responsible for managing the selection process, including: the review and approval of the SSP; appointment of the SSEB; approval of the Contracting Officer's "competitive range" determination;[3] and the final source selection decision, after conducting an "in-depth review and consideration of

---

**1.** The relevant facts recited herein were derived from: the March 29, 2005 Complaint ("Compl."); Plaintiff's Motion for a Preliminary Injunction ("Pl.Mot.Pre.Inj."), Plaintiff's Motion for a Temporary Restraining Order ("Pl.Mot. Temp.Rest."); Defendant's ("Government") April 29, 2005 Cross–Motion for Judgment On the Administrative Record and Opposition to Request for a Preliminary Injunction ("Gov't Mot. J. Admin. Rec."); LB & B's April 29, 2005 Cross–Motion for Judgment On the Administrative Record ("LB & B Cross–Motion"); Plaintiff's May 2, 2005 Motion for Judgment On the Administrative Record ("Pl.Mot. J. Admin.Rec."); LB & B's May 16, 2005 Response ("LB & B Response"); the Government's May 19, 2005 Response ("Gov't Response"); Plaintiff's Response to the Government's and LB & B's Cross–Motions for Judgment On the Administrative Record ("Pl.Re-

sponse"); Transcript of June 15, 2005 Oral Argument ("TR ___."); the Government's June 24, 2005 Supplemental Brief ("Gov't Supp. Brief"); LB & B's June 24, 2005 Supplemental Brief ("LB & B Supp. Brief"); and Plaintiff's June 28, 2005 Supplemental Brief ("Pl.Supp.Brief").

**2.** The SSEB was comprised of three voting members (a chairperson and two technical advisors) and four non-voting members (client agency, contract specialist, and legal advisors). *See* AR at 6.

**3.** A "competitive range" was used to narrow the field of potential bidders only to those with the strongest proposals prior to the Government beginning formal discussions and accepting revised proposals. *See* AR at 11.

all information and data available." *Id.* at 4. The SSA also was responsible for supervising the Contracting Officer and technical evaluators and to "evaluate the best interests of the Government, considering the procurement as well as programmatic concerns." *Id.* at 3.

The Contracting Officer was responsible for: publishing the procurement announcement; drafting the SSP; preparing the Request for Qualifications ("RFQ") and Request for Proposals ("RFP"); conducting a cost analysis for the project; and carrying out all discussions with the offerors. *Id.* at 4–5. The SSP also required the SSEB to assist the Contracting Officer in planning the Solicitation and evaluating the proposals under the specified guidelines. *Id.* at 5.

On January 31, 2001, GSA posted a procurement announcement for the Contract in *Commerce Business Daily* stating that the Solicitation had two phases. *See* AR at 72. During the initial phase, potential bidders were required to submit qualification statements demonstrating their successful performance of full mechanical and elevator maintenance services on three buildings "comparable[4] to the Moynihan U.S. Courthouse." *Id.* at 79. A bidder was required to satisfy the requirements of Phase I in order to participate in Phase II of the Solicitation. *Id.* at 79, 82.

## B. Phase I Of Solicitation GS–02P–00–PLC–0191: Request For Qualifications.

On January 31, 2001, GSA issued an RFQ listing twelve categories of prior experience

with maintenance contracts that a bidder needed to satisfy to establish technical qualification to perform the services required at the Moynihan Courthouse.[5] *See* AR at 78. In addition, the RFQ incorporated several regulatory provisions into the Solicitation[6] and included seven notes for additional reference. *Id.* at 81. For example, Note (1) stated that "[m]ultiple buildings in the same complex are *not* considered as separate buildings, in meeting the 3–building requirement." *Id.* Note (7) stressed that "[o]nly offerors that have met this minimum standard will be eligible to proceed to phase two of this procurement (request for proposals)." *Id.* (emphasis omitted).

On March 6, 2001, LB & B submitted the Byron G. Rogers Federal Building and Courthouse in Denver, Colorado ("Rogers Building and Courthouse"), the Thomas F. Eagleton United States Courthouse in St. Louis, Missouri ("Eagleton Courthouse"), and the James A. Byrne United States Courthouse in Philadelphia, Pennsylvania ("Byrne Courthouse") as references in response to the Phase I Solicitation. *Id.* at 19,673–75. LB & B represented that these buildings met the height, square footage, and other required building characteristics:

> The Byrne [Courthouse] has a tenant population of 400, 8 main motors of 20 HP or greater, and 12 gearless traction elevators, however meets the remaining criteria. Only 198 Fire Alarm points are currently monitored. This building is one of two buildings in the Philadelphia "Byrne–Green Building Complex," connected by a common Utilities Plant, with some utilities shared by the two buildings.[7]

4. The Solicitation defined "comparable" as an office building, courthouse, or hospital at least fourteen stories tall, containing at least 500,000 square feet, and meeting eight of twelve additional building characteristics. *See* AR at 79.

5. The twelve categories were: (1) building population of at least 750 permanent tenants; (2) two chillers over 550 tons each; (3) two oil, gas or dual-fuel boilers; (4) three 75 horsepower chilled water or condenser-water pumps; (5) fourteen main air handlers rated at 10,000 cubic feet per minute; (6) seventeen 20 horsepower air handler, pump, or tower main motors; (7) one 625 kilowatt emergency generator; (8) fourteen gearless traction elevators; (9) 400 fire alarm detec-

tion points; (10) 700 BMS/EMS temperature control points; (11) 480 plumbing fixtures; and (12) 1,225 annual service calls. *See* AR at 79.

6. The following federal regulations were incorporated by reference: (1) FAR § 52.215–1, Instructions to Offerors—Competitive; (2) FAR § 52.233–2, Service of Protest; (3) GSAM § 552.233–70, Protests Filed Directly with the GSA; and (4) GSAM § 552.237–70, Qualifications of Offerors. *See* AR at 81.

7. The Byrne Courthouse and William J. Green Federal Building ("Green Building") comprise a two-building complex located on the corner of Market and Arch Streets near Philadelphia's In-

AR at 675. LB & B's proposal, however, did not identify which of the eight required characteristics were satisfied by the equipment located in the Byrne Courthouse. *Id.* at 679.

On April 4, 2001, the SSEB Chair[8] requested that the Contracting Officer for the Byrne Courthouse ("Byrne Contracting Officer") verify the information provided in LB & B's Phase I proposal. *Id.* at 1627–28. The Byrne Contracting Officer disclosed that he did not know the specific engineering details, but agreed to call back with the Building Manager's contact information. *Id.* at 1628. During an April 13, 2001 telephone conversation, the Building Manager explained to the SSEB Chair that the first two floors of the Byrne Courthouse were connected, but shared a common heating and cooling system. *Id.* at 1633. In an April 16, 2001 facsimile, the SSEB Chair asked the Building Manager to provide him with the courthouse's total square footage, tenant population, and engineering statistics. *Id.* at 1625–32. The second page of the facsimile also added that "[s]ince the Green Building and Byrne [Courthouse] are connected, the building and equipment information from both buildings can be combined[.]" AR at 1626.

Over the next several weeks, the SSEB Chair kept detailed notes of his discussions with the Byrne Contracting Officer, Building Manager, and LB & B representatives concerning the Byrne Courthouse's engineering systems in a series of handwritten notes on a copy of his April 16, 2001 facsimile. *Id.* at 1625. On April 23, 2001, the SSEB Chair left a telephone message for the Building Manager stating that, contrary to his April 16 facsimile, the building's statistics could not

be combined if the addresses were different. *Id.* On April 25, 2001, an LB & B representative informed the SSEB Chair that the Byrne Courthouse and Green Building, in fact, had separate addresses, so they would provide GSA with a revised building characteristic list only including the Byrne Courthouse's data. *Id.* Another April 25, 2001 note, however, states that the complex's shared utility plant, but not its overall characteristics, should be counted toward the Byrne Courthouse's Phase I requirements.[9] *Id.*

On May 1, 2001, LB & B supplemented its Phase I proposal with a facsimile regarding the capacity of the Byrne Courthouse's boilers. *Id.* at 1620. On May 3, 2001, LB & B sent SSEB another facsimile providing revised statistics regarding annual service calls, plumbing fixtures, and types of elevators. *See* AR at 1621–22. On May 4, 2001, the SSEB Chair forwarded the SSEB's compiled information to the Building Manager for verification. *Id.* at 1616–18. The Building Manager confirmed that the data was correct, but that the complex's five 500–ton chillers, four boilers, and 750 kilowatt generator were located in the Green Building. *Id.* at 679, 1615–17.

Although the Solicitation did not allow for buildings with separate addresses to be combined to satisfy the minimum story or square footage requirements, the issue of shared engineering plants was not addressed.[10] *Id.* at 79–82. The SSEB's internal working documents, however, show that all of the Board members supported counting the Byrne Courthouse's shared equipment toward the eight required characteristics.[11] *Id.* at 1614.

---

dependence Hall. *See* AR at 675, 1625–28, 4096. They share a common engineering plant and are connected by a 3,000 square foot glass walkway. *Id.* at 675, 1626. The Byrne Courthouse at 601 Market Street, stands twenty-two stories high and houses federal courtrooms, judges' chambers, jury rooms, and prisoner holding areas. *Id.* at 679, 1627–28. The Green Building at 600 Arch Street, is ten stories high and contains additional court and federal agency offices. *Id.* at 1628.

**8.** Prior to January 16, 2002, the original SSEB Chair served in the dual role of Contracting Officer and SSEB Chair ("Moynihan Contracting Officer"). *See* AR at 567, 1550.

**9.** The Administrative Record is unclear about the SSEB Chair's rationale for returning to the April 16, 2001 position that the shared utility plant could be counted as part of the Byrne Courthouse. *See* AR at 1625.

**10.** The RFQ neither expressly permitted nor prohibited GSA from considering common engineering equipment, located in an adjacent building. *See* AR at 79.

**11.** The signed evaluation form also contained the following handwritten note: "The Byrne [Courthouse] and Green [Building] are part of the same complex, but they are separate buildings. Much of the equipment that supplies the Byrne [Court-

The SSEB also evaluated the Rogers Building and Courthouse, a second multibuilding complex reference provided by LB & B. *Id.* at 1651–54. On April 23, 2001, the SSEB Chair contacted LB & B to ascertain if the Rogers Building and the attached Courthouse had separate addresses. *See* AR at 1650. LB & B's representative stated that they were "one structure/bldg." *Id.* On May 30, 2001, the SSEB Chair was informed that although the buildings were attached and had the same GSA number, the street addresses were different. *Id.* at 1527, 1640. The SSEB and LB & B subsequently decided that only the Rogers Building could be evaluated because it had eighteen stories, although the Courthouse was only five stories high. *Id.*

On June 6, 2001, the Contracting Officer for the Rogers Building ("Rogers Contracting Officer") sent the SSEB Chair a corrected copy of LB & B's proposal to reflect only the information for the Rogers Building. *Id.* at 1637–39. Based on the revised data, the SSEB determined that the Rogers Building met nine of the twelve minimum requirements. *Id.* LB & B's final submission, the Eagleton Courthouse, also satisfied the RFQ requirements. *See* AR at 1527–28.

The SSEB received and evaluated qualification proposals from fifteen firms. *Id.* at 1499. The firms that initially submitted unacceptable buildings were "given one opportunity to show additional evidence of their experience," before the Phase I "go/no go" determination was made. *Id.* at 1498. After a thorough review of the revised submissions, the SSEB recommended that eight firms proceed to Phase II. *Id.* at 1548.[12] In October 2001, the SSEB forwarded the Phase I RFQ Source Selection Report to the SSA for approval. *Id.* at 1549. The SSEB attached several notes to the Report's summary tables to provide the SSA with a detailed explanation of the decision to include shared utility systems but excluding other building characteristics. *Id.* at 1512–13, 1521–27, 1531–32, 1535.[13] On November 19, 2001, the SSA approved the Source Selection Report. *See* AR at 1549.

### C. Phase II Of Solicitation GS–02P–00–PLC–0191: Request For Proposals.

On May 14, 2002, GSA issued the RFP. *Id.* at 89. Only firms that successfully evidenced compliance with Phase I were eligible to submit technical proposals, pursuant to the SSP. *Id.* at 9. As part of Phase II, GSA developed a full Solicitation package, held a pre-proposal conference, and conducted an onsite walk-through. *Id.* at 83, 513.

Incorporating the formal source selection procedures outlined in Part 15 of the Federal Acquisition Regulations ("FAR"), the SSP stated that the Contract would be awarded to the bid proposal that was the "best value" to the Government. *Id.* at 3, 8 ("The objective is to select the proposal that offers the most for the money, not necessarily the lowest price."). Although GSA wanted a technically qualified firm to provide operation and maintenance ("O & M") services for the Moynihan

house] is located in the Green [Building] and will be included in the stats for the Byrne Courthouse." AR at 1614. The note was included in the SSEB's Phase I RFQ Source Selection Report. *See* AR at 1526. In addition to the Byrne Courthouse, two other prospective bidders submitted buildings for comparability to which the SSEB had attributed shared systems. *See* AR at 1525, 1532.

12. Although the SSEB determined that Farrelly Building Services ("Farrelly") did not satisfy the RFQ's requirements, the SSEB referred the firm to the Small Business Administration ("SBA") for a Certificate of Competency ("COC"), pursuant to FAR § 15.101–2. *See* AR at 1548. The SSEB recommended that Farrelly also be allowed to proceed to Phase II, if the SBA issued the COC. *Id.*

13. There were two notes relating to the Byrne Courthouse and Rogers Building attached to LB & B's evaluation: (1) "The Byrne Courthouse and the Green Federal Building are part of the same complex, but are separate buildings. Some of the equipment that supplies the Byrne Courthouse is located in the Green Building and will be included in the statistics for the Byrne Courthouse[; (2) ] The Federal Building and the Courthouse are attached and have the same GSA Building Number. However, they have different street addresses (Courthouse is at 1929 Stout St.); therefore, they are considered to be separate buildings, and only the Federal Building was evaluated." AR at 1526–27. Although the notes could be considered contradictory, the existence of shared equipment was the fundamental difference between the SSEB's treatment of the two buildings. *Id.* at 1526–28.

Courthouse, GSA also was "eager" to lower the costs of operating the facility. *Id.* at 7. Therefore, the evaluation was based equally on price and technical merit. *See* AR at 7, 403, 518. Price was not assigned a specific numerical score, however, the closer the proposals came in technical merit the more price became a determining factor. *Id.* at 9, 403.

Of the nine firms that satisfied the Phase I experience requirements, only five submitted technical proposals. *Id.* at 1548, 1611. The technical factors considered during Phase II were: (1) Past Performance; (2) Preventive Maintenance Plan; (3) Staffing and Authority Plan; (4) Quality Control Plan; and (5) Customer Service Plan. *Id.* at 385–86. The SSEB assigned each technical factor a numerical score based on a ten-point scale and combined the individual scores to determine each bidder's overall technical score. *Id.* at 10, 17–24. On January 30, 2003, LB & B submitted an initial Phase II proposal. *Id.* at 689. Farrelly also proceeded to Phase II after receiving a COC from the SBA. *See* AR at 1611.

Each technical proposal was evaluated by the SSEB against minimum SSP standards without comparison to other proposals. *Id.* at 10. Under the SSP, once the SSEB completed an evaluation of the initial technical proposal, the SSA would determine whether it was necessary to establish a competitive range and conduct discussions with the bidders or award the contract based on the existing submissions.[14] *Id.* at 10–11, 1612. In order to have a satisfactory proposal, a bidder needed to receive a score of five or greater in all five of the technical areas. *Id.* at 36, 43; *see also id.* at 1554 ("To be considered for award, a firm's proposal cannot be deficient on any of the five (5) evaluation factors. That is, the proposal must have received a score of '5' or higher on each factor. A deficiency (score of '4' or less) on any of the evaluation factors renders the

proposal ineligible for award."). The SSEB and the SSA also noted that the RFP should be amended prior to accepting final proposals to "relax" the experience requirements for the Staffing and Authority Plan. *Id.* at 1554. Bids that contained scores of four or less in any area were considered "deficient." *See* AR at 1554.

On March 9, 2004, the SSA approved the Phase II Initial Source Selection Report after concluding that further discussions were required because all five bidders had received at least one score of four or below. *Id.* at 1612–13. After the SSA decided to pursue a negotiated procurement, the SSP required the Moynihan Contracting Officer to address ambiguities and minor errors in the proposals and engage in a series of "communications" with the bidders to develop a competitive range consisting of the most "highly rated" proposals considering both technical merit and price. *Id.* at 11. Discussions would then be held with those bidders within the competitive range and the SSEB was required to point out the deficiencies, weaknesses, ambiguities, and price issues in technical proposals. *Id.* The SSEB concluded that all five bidders were in the competitive range because "[n]o offeror has technical scores that are significantly lower than the other offerors' scores or has prices that are significantly higher than other offerors' prices, that would make them clearly ineligible for award." *Id.* at 1612. The SSA concurred and discussions were held with all five bidders. *Id.*

In a March 22, 2004 letter, the SSEB addressed deficiencies in LB & B's January 30, 2003 Staffing and Authority Plan and Preventive Maintenance Plan. *See* AR at 3742. LB & B was instructed to reconsider the proposed Project Manager candidate, submit the name and qualifications of the proposed Chief Engineer, provide the names of proposed subcontractors, and increase the

---

**14.** 10 U.S.C. § 2305(b)(4)(A) provides: "The head of an agency shall evaluate competitive proposals in accordance with paragraph (1) and may award a contract(i) after discussions with the offerors, provided that written or oral discussions have been conducted with all responsible offerors who submit proposals within the competitive range; or (ii) based on the proposals received, without discussions with the offerors (other than discussions conducted for the purpose of minor clarification) provided that the solicitation included a statement that proposals are intended to be evaluated, and award made, without discussions, unless discussions are determined to be necessary."

number of staff present during peak hours. *Id.* at 3742–43. The SSEB also informed LB & B that Preventive Maintenance ("PM") Guide Cards [15] "must be submitted for all equipment items shown on the Building Inventory List included in the RFP," and that LB & B failed to include guides for the centrifugal refrigeration machine/chiller ("R5") and screw-type refrigeration machine/chiller ("R7"). *Id.* at 3742.

On April 7, 2004, the Moynihan Contracting Officer met with LB & B representatives to discuss the status of the procurement. *Id.* at 3741. At this meeting, LB & B stated that they intended to hire the incumbent Chief Engineer and Assistant Chief Engineer, if awarded the Contract. *Id.* at 3749.

On June 17, 2004, LB & B submitted a revised Phase II proposal that included the missing R5 and R7 PM Guide Cards and presented an entirely new Staffing and Authority Plan. *Id.* at 1037, 1104, 1106–17. LB & B's proposal, however, still did not address the SSEB's request for the names, qualifications, and commitments, if any, of the proposed Chief Engineer and Assistant Chief Engineer. *See* AR at 1114–17. On July 9, 2004, two technical members of the SSEB noted that the Chief Engineer's resume was missing. *Id.* at 1767, 1775. Nevertheless, LB & B's revised Staffing and Authority and Preventive Maintenance Plans ratings were designated as seven. *Id.* at 1772–73. On July 20–21, 2004, the Moynihan Contracting Officer reviewed LB & B's Phase II proposal. *Id.* at 1746. After LB & B's Business Development Manager affirmed LB & B's intent to hire the current Chief Engineer and Assistant Chief Engineer in a July 20, 2004 email, the Moynihan Contracting Officer gave the revised Staffing and Authority Plan a score of eight. *Id.* at 1746, 3749. The Moynihan Contracting Officer also assigned LB & B's Preventive Maintenance Plan a score of eight. *Id.* at 1744–45.

On September 28, 2004, LB & B submitted a second and final revised Phase II proposal, but once again failed to provide any additional information regarding the Chief Engineer and Assistant Chief Engineer. *See* AR at 1148. The SSEB, however, was fully aware of the incumbent engineers' qualifications and, on several occasions, the Moynihan Courthouse staff expressed their interest in having the current engineering team continue their duties. *Id.* at 1333–34, 3630. The SSEB unanimously gave LB & B's final Staffing and Authority Plan, the only part of the proposal being reviewed, an overall rating of eight. *Id.* at 1779, 1786, 1790.

On October 14, 2004, at the behest of the Moynihan Courthouse staff, the Moynihan Contracting Officer asked LB & B to clarify the Chief Engineer and Assistant Chief Engineer's employment status and any commitments made to LB & B. *Id.* at 3630. On October 18, 2004, LB & B responded by email that the Chief Engineer initially was willing to sign a letter of intent, but later changed his mind. *Id.* at 3751. LB & B also stated that it was unable to contact the Assistant Chief Engineer, but intended to hire both. *Id.* On November 8, 2004, the Moynihan Contracting Officer contacted LB & B to reconfirm these plans. *See* AR at 1752, 4100.

In the November 19, 2004 Final Source Selection Report, the SSEB's two technical advisors wrote a Majority Opinion, recommending that the Contact be awarded to Park Tower. *Id.* at 1953, 2036. Specifically, they expressed concern about LB & B's failure to secure commitments from the incumbent Chief Engineer and Assistant Chief Engineer. *Id.* at 2036–41. In a Dissenting Opinion, however, the Moynihan Contracting Officer recommended the selection of LB & B. *Id.* at 2038–41. On December 8, 2004, the SSA determined that LB & B's lower price presented the "best value" to the Government, because LB & B's and Park Tower's technical proposals were comparable. *Id.* at 2069–74. On December 17, 2004, the bidders were notified that the Contract would be awarded to LB & B. *See* AR at 2106–07.

**D. Proceedings Before The Government Accountability Office Concerning Solicitation GS–02P–00–PLC–0191.**

On December 27, 2004, GSA's Contracting Officer and Regional Counsel met with Park

---

**15.** PM Guide Cards identify the maintenance procedures, tools required, the frequency of maintenance, and any other special instructions. *See* AR at 3853.

Tower representatives to discuss the selection process. *Id.* at 2113. In January 2005, Park Tower filed a post-award bid protest with the Government Accountability Office ("GAO"). *Id.* at 2114. On January 12, 2005, the Moynihan Contracting Officer notified LB & B that a protest concerning the award of the Contract had been filed and that GSA was required by 31 U.S.C. § 3553(d)(3)[16] to suspend performance until the GAO issued a final decision. *Id.*

The GAO's post-award bid protest authority is limited to "a determination of whether the agency acted reasonably and consistent with the terms of the solicitation and applicable statutes and regulations." *Id.* at 2127; *see also* 31 U.S.C. § 3554(b)(1).[17] On March 22, 2005, the GAO denied Park Tower's protest. *See* AR at 2126. The GAO found that the SSEB's evaluation process and the SSA's final determination that LB & B's "comparable and lower-priced" offer represented the "best value" to the Government were reasonable. *Id.* at 2127, 2133 ("[W]e find that the evaluation of LB & B's proposal was unobjectionable. The SSA's evaluation conclusions were reached after he performed a detailed review of the SSEB's evaluation conclusions, as well as his own comparative assessment of the proposals against the technical evaluation criteria.").

### PROCEDURAL HISTORY

On March 29, 2005, Park Tower filed a Complaint in the United States Court of Federal Claims alleging that "[a]s a result of GSA's violations of law and regulation and arbitrary and capricious actions Park Tower has been irreparably harmed by the loss of the value of the [C]ontract and the loss of the opportunity to perform the [C]ontract." Compl. ¶ 30. Park Tower also filed Motions for Preliminary Injunction to prohibit LB & B from proceeding with the Contract and a Temporary Restraining Order to remain in effect until the court resolves this case on the merits. *See* Pl. Mot. Pre. Inj. at 2; *see also* Pl. Mot. Temp. Rest. at 1–2.

The Complaint states seven Causes of Action. The First Cause of Action alleges that GSA violated federal procurement statutes and regulations by failing to reject LB & B's Phase I Qualification Statement. *See* Compl. ¶¶ 6–30. Specifically, GSA's interpretation of the RFQ that permitted buildings to share equipment in order to "compl[y] with the specified comparability standards was arbitrary and capricious." *Id.* ¶ 28.

The Second Cause of Action alleges that GSA "improperly waived several requirements of the RFP with respect to the Staffing and Authority Plan and thus failed to evaluate LB & B's Technical Proposal in accordance with the terms of the RFP, in violation of 41 U.S.C. § 253b(a) and 48 C.F.R. § 15.303(b)(4)[.]"[18] *Id.* ¶ 34; *see also id.* ¶¶ 31–33, 35.

The Third Cause of Action alleges that GSA conducted improper discussions with LB & B regarding their Staffing and Authority Plan "with the intent of allowing LB & B the opportunity to revise its Technical Proposal[,]" in violation of 48 C.F.R. § 15.306(d).[19] *Id.* ¶ 39; *see also id.* ¶¶ 36–38, 40–43.

---

**16.** 31 U.S.C. § 3553(d)(3)(A) provides: "If the Federal agency awarding the contract receives notice of a protest ... (i) the contracting officer may not authorize performance of the contract to begin while the protest is pending; or (ii) if authorization for contract performance to proceed was not withheld in accordance with paragraph (2) before receipt of the notice, the contracting officer shall immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract."

**17.** 31 U.S.C. § 3554(b)(1) provides: "With respect to a solicitation for a contract, or a pro-

posed award or the award of a contract, protested under this subchapter, the Comptroller General may determine whether the solicitation, proposed award, or award complies with statute and regulation."

**18.** 48 C.F.R. § 15.303(b)(4) provides: "The [SSA] shall ... [e]nsure that proposals are evaluated based solely on the factors and subfactors contained in the solicitation."

**19.** 48 C.F.R. § 15.306(d) provides: "Exchanges with offerors after establishment of the competitive range. Negotiations are exchanges, in ... a competitive ... environment, between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its

The Fourth Cause of Action alleges that GSA "improperly waived the requirements of the RFP with respect to LB & B's Preventive Maintenance Plan," thereby failing to evaluate LB & B's Technical Proposal according to the terms of Solicitation as required by 41 U.S.C. § 253b(a) and 48 C.F.R. §§ 15.303(b)(4), 15.305(a).[20] Compl. ¶ 47; *see also id.* ¶¶ 44–46, 48.

The Fifth Cause of Action alleges that "GSA's 'greatest value' determination was based at least in part upon misrepresentations made by LB & B in its improper post-final communications[.]" *Id.* ¶ 52; *see also id.* ¶¶ 49–51, 53.

The Sixth Cause of Action alleges that GSA breached "the implied duty of good faith and fair dealing" resulting in Park Tower's loss of "the opportunity to obtain … revenues and profits[.]" *Id.* ¶ 57; *see also id.* ¶¶ 54–56.

The Seventh Cause of Action alleges that GSA's arbitrary and capricious evaluation of LB & B's Phase I RFQ and Phase II RFP denied Park Tower the opportunity to compete for the Contract and secure any resulting profit. *See* Compl. ¶¶ 58–62.

On March 30, 2005, the Government filed a Notice of Appearance and LB & B filed a Motion to Intervene. A telephone status conference was convened by the court on that day. The court orally granted LB & B's Motion to Intervene and subsequently confirmed that decision by the issuance of a March 31, 2005 Order. On April 1, 2005, the Government filed the Administrative Record, together with a Motion for Protective Order. On the same day, the court granted the Protective Order and provisionally sealed the Administrative Record.[21]

On April 29, 2005, the Government filed a Cross–Motion for Judgment on the Administrative Record and Opposition to Plaintiff's Request for Preliminary Injunction. On April 29, 2005, LB & B also filed a Cross–Motion for Judgment on the Administrative Record and Response to Park Tower's Motion for Preliminary Injunction.

On May 3, 2005, Park Tower filed a Motion for Judgment on the Administrative Record. On May 16, 2005, LB & B filed a Response. On May 19, 2005, the Government also filed a Response to Park Tower's Motion for Summary Judgment on the Administrative Record. On May 19, 2005, Park Tower filed a Response to the Government's and LB & B's Cross–Motions for Judgment on the Administrative Record and a Reply to the Government's Opposition to Plaintiff's Request for Preliminary Injunction.

On June 15, 2005, the court held an oral argument on the parties' Cross–Motions for Judgment on the Administrative Record. On June 24, 2005, the Government and LB & B filed Supplemental Briefs. On June 28, 2005, Park Tower filed a Supplemental Brief.

## DISCUSSION

### A. Jurisdiction.

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320, §§ 12(a), 12(b), authorized the United States Court of Federal Claims to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation

---

proposal. These negotiations may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract. When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions…."

**20.** 48 C.F.R. § 15.305(a) provides: "Proposal evaluation is an assessment of the proposal and the offeror's ability to perform the prospective contract successfully. An agency shall evaluate

competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation. Evaluations may be conducted using any rating method or combination of methods, including color or adjectival ratings, numerical weights, and ordinal rankings. The relative strengths, deficiencies, significant weaknesses, and risks supporting proposal evaluation shall be documented in the contract file."

**21.** The court does not consider any of the information submitted by the parties, discussed herein, to be of a confidential or business proprietary nature.

in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

The United States Court of Federal Claims also has "jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States[.]" 28 U.S.C. § 1491(a)(1). Since the Tucker Act only serves as a "jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Therefore, a plaintiff must identify and plead an independent contractual relationship for the court to have jurisdiction. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed.Cir.2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Trauma Service Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir. 1997) ("To show jurisdiction ... [a Plaintiff] must show that either an express or implied-in-fact contract underlies its claim.").

Park Tower challenges GSA's award of the Moynihan Federal Courthouse's Mechanical and Elevator Maintenance Service Contract to LB & B. *See Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir.2004) (quoting 5 U.S.C. § 702) ("Under the APA, '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.' "). Park Tower also argues that the Government breached the implied contract of good faith and fair dealing. *See Southfork Systems, Inc. v. United States*, 141 F.3d 1124, 1132 (Fed.Cir.1998) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed.Cir.1983) (*en banc*)) ("The jurisdictional basis for such suits is the alleged breach of 'an implied contract to have the involved bids fairly and honestly considered.' "). Therefore, the court has determined that it has jurisdiction

to adjudicate Park Tower's claims in this case.

**B. Standing.**

**1. Park Tower Has Established That It Is An "Interested Party."**

As a threshold matter, a protester must establish that it is an "interested party." 28 U.S.C. § 1491(b)(1); *see also Nat'l Fed'n of Fed. Employees v. Cheney*, 883 F.2d 1038, 1053 (D.C.Cir.1989) ("Not every bidder in a solicitation may assert disappointed bidder standing, otherwise nuisance suits could handicap the procurement system."). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" as synonymous with "interested party," as defined by the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3551.[22] *See Banknote Corp.*, 365 F.3d at 1352 (holding that the United States Court of Federal Claims' jurisdiction under the amended Tucker Act is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."). A two-part test is applied to determine whether a protester may be deemed an "interested party:" (1) the protestor must show a connection to the procurement; and (2) the protester must have an economic interest in the procurement. *See Am. Fed'n Gov't Employees, AFL–CIO v. United States*, 258 F.3d 1294, 1302 (Fed.Cir. 2001) ("We ... hold that standing under [28 U.S.C.] § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.").

Park Tower submitted a qualification statement, a technical proposal, and two subsequent revisions regarding Solicitation GS–02–00–PLC–0191. *See* AR at 1163, 1173, 1372, 1487. On November 19, 2004, two members of the SSEB recommended that the Contract be awarded to Park Tower. On December 17, 2004, GSA concurred in the

---

22. 31 U.S.C. 3551(2)(A) provides: "The term 'interested party,' with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."

award of the Contract to LB & B. *Id.* at 2036–37, 2106–07. As the incumbent contractor and first runner up to LB & B, Park Tower has a direct economic interest in the award of the Contract and has standing as an "interested party." *Id.* at 2036–37.

## 2. Park Tower Has Established That It Has Been "Prejudiced."

Since "the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003). To prevail, the disappointed bidder must provide evidence not only of a significant error in the procurement process, but also that the error caused prejudice. *See Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996) ("[A] showing of a mere possibility that the protester would have received the contract but for the error is inadequate to show prejudice."). The disappointed bidder must show that there was a "substantial chance" it would have received the contract award but for the alleged error. *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1086 (Fed.Cir.2001) (citation omitted) ("To establish prejudice in an action involving an alleged statutory or regulatory violation, a protester must show that absent the error, 'there was a substantial chance it would have received the contract award.'"); *see also Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1368 (Fed.Cir.1999) ("A protester demonstrates prejudice by showing 'that there was a substantial chance it would have received the contract award' if the government had not violated the law."); *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir. 1996) ("Thus, for [plaintiff] to prevail it must establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error.").

The test reflects a "reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error during the procurement process have a forum available to vent their grievances." *Data Gen. Corp.,* 78 F.3d at 1563.

Since a majority of the SSEB recommended that the Contract be awarded to Park Tower, Park Tower has demonstrated that but for an alleged error in the procurement process, Park Tower had a substantial chance of receiving the Contract. Therefore, Park Tower has established that it has been prejudiced.

## C. Standard Of Decision In Post Award Bid–Protests.

Pursuant to the amended Tucker Act, the United States Court of Federal Claims reviews challenges to agency decisions pursuant to the standards set forth in the Administrative Procedure Act ("APA"). *See* 28 U.S.C. § 1491(b)(4). Pursuant to that standard of review, as applied in *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970), "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa,* 238 F.3d at 1332; *see also Bannum, Inc. v. United States,* 404 F.3d 1346, 1351 (Fed.Cir.2005) (holding that initially, trial courts determine if the Government "acted without rational basis or contrary to law when evaluating the bids and awarding the contract."); *Banknote Corp.,* 365 F.3d at 1351 ("In bid protest cases filed under the ADRA, the court implements this APA standard by applying the standard as previously interpreted by the district courts[.]"); *Info. Tech. & Applications Corp.,* 316 F.3d at 1319 ("We reapply the 'arbitrary and capricious' standard of [S]ection 706 of the Administrative Procedure Act to the ... procurement decision.").

The "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Impresa,* 238 F.3d at 1333 (citations omitted). This burden is particularly great where the procurement is a "best value" procurement, as is the case here. *See TRW, Inc. v. Unisys Corp.,* 98 F.3d 1325, 1327 (Fed.Cir.1996) ("In determining whether the agency has complied with the

regulation authorizing best value procurements, the [reviewing authority] may overturn an agency's decision if it is not grounded in reason."). A Contracting Officer also is "entrusted with a relatively high degree of discretion [during a negotiated procurement]." *Galen Med. Assoc., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed.Cir.2004); *see also American Tel. and Tel. Co. v. United States*, 307 F.3d 1374, 1379 (Fed.Cir.2002) ("Moreover, in a negotiated procurement, as in this case, this court has held that the regulations entrust the contracting officer with especially great discretion, extending even to his application of procurement regulations."). The "decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment[.]" *Sperry Flight Sys. v. United States*, 212 Ct.Cl. 329, 548 F.2d 915, 921 (1977).

Therefore, where the court finds a "reasonable basis" for the agency's action, the court should "stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir. 1989); *see also Grimberg Co.*, 702 F.2d at 1372 (holding that the Court may interfere with the Government procurement process "only in extremely limited circumstances"). This standard recognizes a zone of acceptable results in each particular case and requires that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

If the court finds that the agency's conduct fails the APA review, then it must inquire if the bidder was prejudiced by the Government's conduct. *See Bannum*, 404 F.3d at 1351. A claim will only succeed if both requirements are satisfied. *Id.*

The standard of review for a Motion for Judgment on the Administrative Record,

pursuant to United States Court of Federal Claims Rule ("RCFC") 56.1, is similar but not identical to a motion for summary judgment. *See Bannum*, 404 F.3d at 1355. The inquiry on a motion for summary judgment is whether the moving party has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* RCFC 56. In contrast, the standard for a decision on a Motion for Judgment on the Administrative Record is narrower, *i.e.*, given all the disputed and undisputed facts, whether the plaintiff has met the burden of proof to show that the decision was not in accordance with the law. *See Bannum*, 404 F.3d at 1357 (instructing the court to make "factual findings under RCFC 56.1 from the [limited] record evidence as if it were conducting a trial on the record.").

### D. The Court's Resolution Of Park Tower's Motion For Judgment On The Administrative Record.

#### 1 The GSA's Determination That LB & B Satisfied The Requirements Of Phase I Of The Solicitation Was Reasonable And Supported By The Record.

Claim I of the Complaint alleges that GSA violated federal procurement statutes and regulations by failing to reject LB & B's Phase I Qualification Statement. *See* Compl. ¶¶ 6–7. The RFQ required potential bidders to provide references of at least three buildings with characteristics comparable to the Moynihan Courthouse, as a prerequisite to proceed to Phase II of the procurement. *See* AR at 72–73, 79. Park Tower argues that the Phase I Source Selection Report improperly considered "shared" equipment when calculating required building characteristics for multi-building complexes submitted as part of the RFQ. *See* Pl. Mot. J. Admin. Rec. at 7. Accordingly, Park Tower argues that GSA should not have allowed LB & B to proceed to Phase II, because one reference, the Byrne Courthouse, only met four of twelve required building characteristics. *Id.* at 9–11.

Federal agencies are required by law to evaluate proposals according to the criteria established within the Solicitation. *See* 10 U.S.C. § 2305(b)(1) ("[A]n agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."). A disappointed bidder can present a valid claim, if the procurement agency included evaluation factors different from those announced in the Solicitation and the bidder was prejudiced as a result. *See Alfa Laval Separation, Inc.*, 175 F.3d at 1367–68. Here, Park Tower relies on Note (1)'s statement that "[m]ultiple buildings in the same complex are *not* considered as separate buildings, in meeting the 3-building requirement" as authority for why shared systems should have been excluded as references. *See* Pl. Mot. J. Admin. Rec. at 7–8; AR at 81. Park Tower, however, has ignored the plain meaning of the Note. The quoted language precludes a potential bidder from submitting a single three-building complex in order to satisfy the RFQ requirement. The Note, however, does not prohibit GSA from considering "shared" equipment, when determining the comparability of one building within a multi-building complex.

During the evaluation of the Byrne Courthouse's references, the Moynihan Contracting Officer determined that the Byrne Courthouse exceeded both the required number of stories and square footage and met eight of the twelve RFQ characteristics. *See* AR at 1614. Although the boilers, chillers, pumps, and generators were located in the Green Building, they served both buildings and were maintained by LB & B. Accordingly, the SSEB recommended that the equipment be counted as a *bona fide* reference and LB & B be permitted to proceed to Phase II. *Id.*

at 1526.[23] On November 19, 2001, the SSA concurred with the SSEB's rationale and approved the Phase I Source Selection Report. *Id.* at 1549. Therefore, GSA's decision that the process was acceptable under the language of the Solicitation was reasonable under the circumstances and supported by the record.

Park Tower also challenged GSA's award on the grounds that the SSA did not independently address the issue of "shared" equipment. *See* Pl. Supp. Brief at 6–7. Citing the SSP, RFQ, and RFP, Park Tower argued that Phase I and Phase II together comprised "the Solicitation" for the purposes of 41 U.S.C. § 253b(a)-(b) and 48 C.F.R. §§ 15.303(b)(4), 15.305(a). *Id.* at 6. Accordingly, Park Tower reasons that the SSA was required to make and document the source selection based on a comparative assessment of proposals against all source selection criteria, including the RFQ's three building requirement in the Solicitation. *Id.* at 2; *see also* 48 C.F.R. § 15.308.[24]

The RFQ, however, does not address the issue of shared or common equipment and all evaluation factors must be stated in the Solicitation. *See* AR at 78–81; *see also* 48 C.F.R. § 15.303(b)(4) ("The source selection authority shall . . . (4) Ensure that proposals are evaluated based solely on the factors and subfactors contained in the solicitation[.]"). Therefore, the issue of shared equipment does not need to be addressed by the SSA. Although the SSA did not specifically mention the use of shared equipment in the Source Selection Decision, the Administrative Record unquestionably shows that the SSA carefully considered all aspects of the decision throughout the four-year procurement.

23. In that regard, LB & B was not the only bidder to have shared equipment considered during Phase I. *Id.* at 1525, 1532. Two other firms listed buildings that shared engineering plants with adjacent buildings as references. *Id.* In all three cases, the SSEB noted that only equipment that served both buildings would be considered under the RFQ. *Id.* at 1525–26, 1532.

24. 48 C.F.R. § 15.308 provides: "The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solici-

tation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision."

*See* AR at 2068–74.[25] The United States Supreme Court has long held that Government officials are presumed to have carried out their duties in an appropriate manner. *See United States v. Chem. Found., Inc.* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *see also Schism v. United States,* 316 F.3d 1259, 1302 (Fed.Cir.2002) (citations omitted) ("This presumption of regularity is the supposition that public officers perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations, and is valid and binding unless 'well-nigh irrefragable proof rebuts or overcomes it.' "). Therefore the court discerns no basis for determining that the SSA acted in disregard of applicable regulations.

### 2. GSA's Determination That LB & B Satisfied The Staffing And Authority Plan Was Reasonable And Supported By The Record.

■ In addition, the Complaint alleged that GSA "improperly waived several requirements of the RFP with respect to the Staffing and Authority Plan and thus failed to evaluate LB & B's Technical Proposal in accordance with the terms of the RFP[.]" Compl. ¶ 34. Park Tower argues that GSA's evaluation of LB & B's Staffing and Authority Plan was arbitrary and capricious because it failed to consider the absence of the proposed Chief Engineer and Assistant Chief

Engineer's responsibilities, resumes, and any commitments to work for LB & B as required by the RFP.[26] *See* Pl. Mot. J. Admin. Rec. at 14–21.

It is true during GSA's initial discussions with LB & B that there was no discussion of the deficient description of the Chief Engineer and Assistant Chief Engineer's responsibilities. *See* AR at 3742. Although Park Tower's Phase II proposal included a general description of both Chief Engineer and Assistant Chief Engineer's responsibilities,[27] the same information reasonably could be inferred from LB & B's organizational chart, the titles of the positions, and the nature of the Contract. For example, LB & B's organizational chart showed that the Chief Engineer reported to the Project Manager and placed the Assistant Chief Engineer directly below the Chief Engineer. *Id.* at 1114. In addition, all additional engineers and maintenance personnel were placed below the Assistant Chief Engineer. *Id.* Therefore, it is reasonable to assume that the SSEB understood what the positions entailed from LB & B's organizational chart and LB & B's expressed intent to hire the incumbent Chief Engineer and Assistant Chief Engineer, if it was awarded the Contract.

The SSEB's March 22, 2004 letter, however, noted that "LB & B did not submit the name and qualifications/experience of its proposed Chief Engineer." *Id.* at 3742. LB & B responded to the SSEB's concerns during an April 7, 2004 negotiation session and again in the Business Development Manager's July 20, 2004 email to the Moynihan Contracting

---

**25.** The SSA's signature on the final page of the Source Selection Report under the statement "Approved by," indicates that he reviewed the report and approved the decisions made by the SSEB. *See* AR at 1549.

**26.** The RFP instructed bidders to "submit an organizational chart showing the names and titles of proposed key managerial and supervisory personnel ... which describes their respective authorities and responsibilities [and describes] the qualifications and experience for such key personnel." AR at 385. In addition, bidders were to submit resumes for the Project Manager and all other on-site supervisors, which included the Chief Engineer and Assistant Chief Engineer. *Id.* at 109–10, 385.

**27.** Park Tower included the following descriptions of the Chief Engineer and Assistant Chief Engineer's responsibilities together with their respective resumes: (1) the Chief Engineer shall "[s]upervise Engineering Department personnel, maintenance and operation of building systems and equipment. He will be responsible for the efficient implementation and operation of the P.M. Program by directing the engineers and outside contractors to perform in accordance with the PM Program and our strict requirements[;]" (2) the Assistant Chief Engineer shall "[a]ssist Chief Engineer in scheduling, supervising Engineering Department. Repair, maintain and troubleshoot electrical equipment, maintain and repair building equipment." AR at 1327, 1329.

Officer by stating that it intended to hire the current Chief Engineer and Assistant Chief Engineer. *Id.* at 3749; *see also* LB & B Response at 6–8. The November 19, 2000 SSEB Final Source Selection Report commented:

> The Board realizes the difficulties encountered when a potential follow-on contractor attempts to solicit for employment any of the existing on-site personnel. The Board also understands the reluctance of the on-site personnel to sign a formal commitment with another contractor. It seems very likely that both individuals want to continue working at 500 Pearl Street courthouse and that LB & B would do whatever they can to retain them, considering [the Chief Engineer and Assistant Chief Engineer's] strong familiarity and knowledge of the building.

*Id.*

The SSP only required bidders to submit information "regarding the qualifications and experience of [proposed] key personnel, that is sufficient for the Government to judge their competence." AR at 20. In this situation, GSA had a long working relationship with the Chief Engineer and Assistant Chief Engineer,[28] copies of the relevant resumes, and apparently was satisfied by LB & B's representations regarding their future employment. *Id.* at 1990; *see also Dubinsky v. United States*, 43 Fed.Cl. 243, 272 n. 66 (1999) ("The court notes that an agency may consider information in its possession relevant to an offeror's proposal; this is an exception to the general rule that an agency may only look within the four corners of a proposal when it is evaluating a proposal."); *Forest Regeneration Servs. LLC*, 2002 C.P.D. ¶ 187, 2002 WL 31429140, at *4 (Comp.Gen. Oct.30, 2002) ("An agency is not limited to the 'four corners' of an offeror's proposal in the evaluation of proposals, and may use other information known by its own evaluators."); *Arctic Slope World Servs., Inc.*, 2000 C.P.D. ¶ 75, 2000 WL 675594, at *7 (Comp.Gen. Apr.27, 2000) ("An agency may properly use information known by its own evaluators, as with any other references, to aid in the evaluation of proposals, including evaluating offeror experience."); *Fidelity Technologies Corp.*, 97–1 C.P.D. ¶ 197, 1997 WL 284732, at *4 (Comp.Gen. May 30, 1997) ("The [Government] argues that it could only consider information within the four corners of that proposal. This argument is unpersuasive, both because the inconsistencies within the proposal itself put the contracting officer on notice of the apparent error and because an agency may take into account its knowledge in evaluating proposals and making an award.").[29]

Regarding the absence of a commitment from either the incumbent Chief Engineer or Assistant Chief Engineer, the RFP stated: "[i]ndicate if such persons are currently in the offeror's employ, or if not, what commitments have been made to hire them." AR at 386. To be sure, the absence of any reference to a commitment in LB & B's final Phase II proposal indicates that no commitments had been made. On October 14, 2004 and November 8, 2004, however, GSA contacted LB & B to clarify whether LB & B had received any commitment from either the incumbent Chief Engineer or Assistant Chief Engineer. *Id.* at 3630, 4100. In an October 18, 2004 email, LB & B responded that the Chief Engineer initially was willing to sign a letter of intent, but later changed his mind. *Id.* at 3251. LB & B also indicated that Human Resource personnel were unable to contact the Assistant Chief Engineer. *Id.* at 3630.

---

28. The Chief Engineer had been in his position for four years, including nine total years in other relevant positions in the Moynihan Courthouse. *See* AR at 1990. The Chief Assistant Engineer had been in his position for three years, with a total of 10 years in other relevant positions in the Moynihan Courthouse. *Id.*

29. Although GAO decisions are not binding on the court, they can be of great value when considering issues of federal procurement law. *See Thompson v. Cherokee Nation of Okla.*, 334 F.3d 1075, 1084 (Fed.Cir.2003) (citations omitted)

("Several fundamental principles of appropriations law, as enunciated by the [United States] Supreme Court, by this court, by our predecessor court, and by other circuits are relevant to this case. These decisions have relied on the opinions of the General Accounting Office ('GAO'), as expressed in *Principles of Federal Appropriations Law ('GAO Redbook')*, and on the opinions of the Comptroller General, both of whose opinions, while not binding, are 'expert opinion[s],' which we should prudently consider.").

Therefore, LB & B's submission evidenced that no commitment existed. *Id.* at 1990.

The SSEB decided, however, to consider LB & B's failure to secure written commitments from the Chief Engineer and Assistant Chief Engineer further. The Final Source Selection Report's Majority Opinion stated that "the risk inherent in an award to a contractor who does not have an enforceable obligation to retain key personnel after the inception of the new contract greatly mitigates any cost to the Government." *Id.* at 2038. The Dissenting Opinion, authored by the Moynihan Contracting Officer, however, argued that "LB & B explained that they were ultimately unable to obtain written commitments from either of these two individuals because, LB & B believes, they might be afraid that by signing a commitment to work for LB & B, they could potentially jeopardize their employment with their current employer[.]" AR at 2040. The Moynihan Contracting Officer also noted that no "enforceable obligation" for the incumbent engineers to continue working for Park Tower existed. *Id.* Although the SSEB disagreed, the SSA's final decision was well reasoned and supported by the record.

It is important for Park Tower to understand that there is also no evidence in the SSEB's Final Source Selection Report to show that LB & B's summary reference to Chief Engineer and Assistant Chief Engineer's responsibilities would have materially altered GSA's ultimate evaluation in this case. *Id.* at 1983–90, 2020–28. Assuming *arguendo* that the SSEB had downgraded LB & B's Staffing and Authority Plan, there is no reason to assume that such a discrepancy would have significantly impacted the SSA's "best value" determination.

Therefore, GSA's determination that LB & B satisfied the Staffing and Authority Plan was reasonable and supported by the record.

### 3. GSA's Discussions With LB & B After Submission Of The Final Phase II Proposals Were Not Improper.

■ Claim III of the Complaint alleged that GSA conducted improper discussions with LB & B regarding its Staffing and Authority Plan after the Final Phase II Pro-

posals submission date. *See* Compl. ¶ 39; *see also* Pl. Mot. J. Admin. Rec. at 14–31. Specifically, Park Tower takes issue with the fact that the October and November contacts provided LB & B with an opportunity to modify its proposal, without providing Park Tower the same opportunity. *Id.* GSA counters that these communications were not "negotiations," but were "requests for clarification." *See* Gov't. Mot. J. Admin. Rec. at 20.

In the context of a Government procurement, the term "discussions" has a specific legal definition: "discussions involve negotiations" and "are undertaken with the intent of allowing the offeror to revise its proposal." *Info. Tech. & Applications Corp.*, 316 F.3d at 1321 (citations omitted). In contrast, "clarifications" are "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." *Id.* Here, the Moynihan Contracting Officer's contacts with LB & B were not initiated to encourage LB & B to modify the proposal by submitting additional information. Instead, these communications were initiated to clarify if LB & B still intended to hire the incumbent personnel. Although the SSEB admits to considering the information received from LB & B, as discussed here, this fact alone does not transform clarifications into improper discussions.

The court is troubled by the appearance of unfairness that these communications caused. Without more, however, such an appearance does not render the GSA's decision to award the Contract to LB & B in this case unreasonable.

### 4. GSA's Evaluation Of LB & B's Preventive Maintenance Plan Was Reasonable And Supported By The Record.

■ Claim IV of the Complaint alleged that GSA "improperly waived the requirements of the RFP[.]" Compl. ¶ 47. The parties disagreed as to what the RFP required bidders to include in their PM Plans. *See* Pl. Mot. J. Admin. Rec. at 33–34. Bidders were required to submit the maintenance procedures and frequency of performing PM "for each piece of equipment listed in the

Building Inventory." *See* AR at 385. The inventory included in the RFP contained forty-two pieces of cafeteria equipment, but mistakenly identified each piece with the Guide Card designation for the dish and tray conveyor belt ("K100"). *Id.* at 140. Relying on the text of the RFP, LB & B submitted the K100 guide to cover all of the cafeteria equipment. *Id.* at 936.

Park Tower asserted that GSA ignored LB & B's failure to address all aspects of the PM Plan as mandated by the RFP and should have been downgraded because the plan did not include separate PM guides for all of the cafeteria equipment. *See* Pl. Mot. J. Admin. Rec. at 31–35. In contrast, Park Tower's revised proposal included nineteen K-series guide cards that covered the conveyor and ten other "major" pieces of cafeteria equipment. In regard to the guides for the other thirty-one other pieces of cafeteria equipment it did not include, Park Tower stated that the equipment was covered the following paragraph on the Boiler/Generator, Steam Guide Card:

> For [PM], any problem that is found outside of regular preventive maintenance that needs to be remedied will be taken care of according to unscheduled maintenance and customer service guidelines. If it is an emergency situation, it will be responded to immediately. If it is a routine problem, it will be taken care of within 24 hours.

AR at 1467. This language, however, is not a PM plan nor a Guide Card for the other thirty-one pieces of cafeteria equipment. Instead, this language restates information on unscheduled maintenance provided elsewhere in Park Tower's proposal.

Park Tower also challenged LB & B's use of equipment Guide Cards copied from GSA's Preventive Maintenance Guide Book that established procedures for much of the equipment located in commercial buildings. *Id.* at 3633. Park Tower argued that LB & B did not "tailor" its PM plan to the Moynihan Courthouse. *See* Pl. Mot. J. Admin. Rec. at 34. LB & B countered that the solicitation language was satisfied in that the word "should" gave the bidders the option to develop Guide Cards specific to the Moynihan Courthouse. Here, Park Tower overlooked the fact that the final technical proposal submitted by the company also included nineteen Guide Cards derived from GSA's Preventive Maintenance Guide Book

Even if GSA adopted Park Tower's proposed construction as more thorough than LB & B's, nevertheless, Park Tower's proposal was incomplete and would merit a score of four or less. In the Final Source Selection Report, however, the SSEB decided that the failure to include specific cafeteria equipment Guide Cards should not be deemed a significant weakness because of the RFP's error. *Id.* at 1982. "If LB & B [or another bidder] had failed to provide [G]uide [C]ards for multiple, unrelated pieces of equipment, this would be considered to be a significant weakness and/or deficiency." *Id.* LB & B's proposal was satisfactory because the plan included the single Guide Card specified for each piece of cafeteria equipment on the Building Inventory. LB & B's final PM Plan received a score of seven. *Id.* Park Tower's submission was "considered to be particularly thorough and complete because they provided Guide Cards for many of the individual equipment items/appliances in the cafeteria and not just the item that is normally associated with the [K100] Guide Card." *Id.* at 2020. Park Tower's final PM Plan received a score of eight.

Although it is unquestionably the case that LB & B could have identified the problem with the RFP, asked GSA to issue an amendment, and then developed a complete set of PM Guides for the Moynihan Courthouse, it is equally true that LB & B was not required to take any of those steps under the Solicitation. Moreover, there was nothing inherently unreasonable in the scoring of the two proposals, since neither party specifically addressed all forty-two items. Therefore, GSA's evaluation of LB & B's preventive maintenance plan was reasonable and supported by the record.

**5. GSA's Determination That LB & B's Proposal Was The "Best Value" To The Government Was Reasonable And Supported By The Record.**

 Claim V of the Complaint alleged that "GSA's 'greatest value' determination

was based at least in part upon misrepresentations made by LB & B in its improper final communications[.]" Compl. ¶ 52. Park Tower argued that the SSA's "best value" determination was flawed because it relied on improper communication with LB & B regarding LB & B's intent to hire the Chief Engineer and Assistant Engineer. *See* Pl. Mot. J. Admin. Rec. at 36–37. In addition, Park Tower argues that two proposals were not comparable in technical merit because Park Tower received a superior technical score, which should have resulted in the award of the Contract. *Id.* at 37.

In a "best value" determination, the agency has greater discretion than if the contract were to have been awarded on the basis of cost alone. *See E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the [G]overnment.... Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion."). Since the "best value" determination in this case was made following an extended negotiated procurement, Park Tower has a particularly high burden to prove that the award was arbitrary and capricious. *See Galen Med. Assoc., Inc.,* 369 F.3d at 1330 (citations omitted) ("The higher burden exists because the contracting officer engages in what is inherently a judgmental process."); *see also Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 597 (1980) ("[T]he greater the discretion granted to a contracting officer, the more difficult it will be to prove the decision was arbitrary and capricious.")

Park Tower has not demonstrated that the SSA finding that the LB & B proposal provided the best value to the Government was unreasonable. There is also no basis to determine that the SSEB's conclusions were based on misrepresentations regarding the

Chief Engineer's and Assistant Chief Engineer's intent to continue working at the Moynihan Courthouse, if LB & B were awarded the Contract. Park Tower emphasizes inconsistencies between LB & B's October 18, 2004 email to the Moynihan Contracting Officer and declarations made by Park Tower's Program Manager, as well as the incumbent Chief Engineer and Assistant Chief Engineer. *See* Pl. Mot. J. Admin. Rec. at 38. Although the parties maintain slightly different versions of the events, the only discrepancy worthy of any note is the Chief Engineer's initial agreement to sign a letter of intent or not. There is no basis to conclude that the difference of opinion, however, was anything more than a faulty memory caused by the passage of time.[30]

The SSA's conclusions were reached only after a detailed review of the SSEB's Final Source Selection Report was conducted and a comparative assessment of the proposals against the technical evaluation criteria was made. Tradeoffs between merit and price are acceptable when deciding on competing proposals. The issue was not the difference between Park Tower and LB & B's overall scores, but whether the significance of the difference in scores was reasonable and adequately justified. Evaluation scores are merely guides for the selection official, who must exercise judgment to determine how any technical difference between the competing proposals will effect contract performance. The SSA's evaluation of the two proposals and the SSEB's Final Source Selection Report explain that Park Tower's higher score did not represent any significant technical superiority. Consequently, GSA's final award of the Contract to LB & B, under the circumstances, was reasonable and supported by the record.

**6. GSA Did Not Breach The Implied Duty Of Good Faith And Fair Dealing In This Case.**

Claim VI of the Complaint alleged that GSA breached the duty of good faith and fair dealing. *See* Compl. ¶ 57. The covenant of

---

**30.** LB & B's submission was silent on the issue of the incumbent Chief Engineer and Assistant Chief Engineer's commitments. LB & B did not, in fact, receive any commitments from the two men and LB & B's proposal was entirely consistent with the language of the RFP.

good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner. *See* RESTATEMENT (SECOND) OF CONTRACTS § 205; *see also Rumsfeld v. Freedom NY, Inc.,* 329 F.3d 1320, 1330 (Fed.Cir.2003) ("Government coercion may be supported by a finding that the government engaged in wrongful acts by violating the contract without a good-faith belief that its actions were justified or by violating the covenant of good faith and fair dealing implicit in every contract."); *Essex Electro Eng'rs, Inc. v. Danzig,* 224 F.3d 1283, 1291 (Fed.Cir.2000) (citation omitted) ("Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation that neither party will do anything that will hinder or delay the other party in performance of the contract."). The covenant "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to ... destroy the reasonable expectations of the other party regarding the [purpose] of the contract." *Centex Corp. v. United States,* 395 F.3d 1283, 1304 (Fed.Cir.2005). This duty applies to the Government throughout the procurement process. *Id.*

If the Government carries out a procurement in an arbitrary and capricious manner, then it has breached the implied contract to consider all bids fairly and honestly. *See Southfork Sys.,* 141 F.3d at 1132 (quoting *Central Arkansas Maint., Inc. v. United States,* 68 F.3d 1338, 1341 (Fed.Cir.1995)) ("The government is said to breach the implied contract 'if its consideration of offers is found to be arbitrary and capricious toward the bidder-claimant.'"). In essence, the Government promises to comply with the applicable sections of the FAR when conducting a procurement and may be held liable for damages if it acts contrary to any statute or regulation. *See Southfork Sys.,* 141 F.3d at 1135.

■ The predecessor court to the United States Court of Appeals for the Federal Circuit identified four relevant factors to help determine if a breach of the duty of good faith and fair dealing has occurred: (1) absence of a reasonable basis for the administrative decision; (2) the amount of discretion afforded to the procurement officials by applicable statutes and regulation; (3) proven violations of pertinent statutes or regulations; and (4) subjective bad faith. *See Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974). The court's determination in this case that the award of the Contract was reasonable and the GSA did not violate any statute, regulation, or provision of the United States Constitution, however, renders the first three factors moot.

■ Turning to the remaining fact, Park Tower bears a heavy burden to present evidence that GSA acted in bad faith. *See Caldwell & Santmyer, Inc. v. Glickman,* 55 F.3d 1578, 1581 (Fed.Cir.1995) ("A contractor can overcome this presumption only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it."). Over the four-year negotiated procurement, GSA provided feedback and allowed the bidders to revise their proposals three times. Each time, the SSEB's conclusions were reviewed by GSA's regional legal advisors and approved by the SSA. *See* AR at 1549,1613, 1953, 2068. Although the SSA eventually acted against the recommendation of the majority of the SSEB, Congress and the federal courts have granted agencies a large amount of discretion in making best value determinations. *See E.W. Bliss Co.,* 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."); *see also* 48 C.F.R. § 15.303 ("The source selection authority shall ... (5) [c]onsider the recommendations of advisory boards or (6) [s]elect the source ... whose proposal is the best value to the Government."); 48 C.F.R. § 15.308 ("While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment.").

The court discerns nothing in the Administrative Record that supports any allegations of misconduct and Park Tower has failed to overcome the presumption of regularity given to Government officials in the course of their duties. *See A–Transport Northwest Co., Inc. v. United States,* 36 F.3d 1576, 1585

(Fed.Cir.1994) (citation omitted) ("Since the Government is entitled to a presumption that it acted in good faith, a contestant bears the burden of proof on the issue."). Therefore, as a matter of law, Park Tower's claim alleging breach of the implied contract of good faith and fair dealing is dismissed.

## CONCLUSION

For the reasons discussed herein, Park Tower's March 29, 2005 Motion for a Permanent Injunction and May 2, 2005 Motion for Judgment Upon the Administrative Record are denied. The Government's April 29, 2005 Cross–Motion for Judgment Upon the Administrative Record is granted.

The Clerk of the Court is ordered to dismiss Park Tower's March 29, 2005 Complaint.

**IT IS SO ORDERED.**