SYSTEMS PLUS, INC., Plaintiff,

v.

UNITED STATES, Defendant,

Netstar–1, Inc., Intervening Defendant.

No. 05–1219C.

United States Court of Federal Claims.

Filed Under Seal: Feb. 22, 2006.

Reissued: Feb. 28, 2006.

Thomas C. Papson, McKenna Long & Aldridge LLP, Washington, D.C., for plaintiff. With him on the briefs were David Kasanow, Kara Klaas, Dana Pashkoff, and Steven Sarfatti.

Jerome A. Madden, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Assistant Attorney General Peter D. Keisler, David M. Cohen, Director, and Todd M. Hughes, Assistant Director, Commercial Litigation Branch, Washington, D.C. Dennis Adelson, Office of the Solicitor, United States Department of Labor, Washington, D.C., was of counsel.

William F. Savarino, Cohen Mohr, LLP, Washington, D.C., for intervening defendant. With him on the briefs were John J. O'Brien and James S. DelSordo.

## OPINION AND ORDER [1]

### LETTOW, Judge.

This action arises out of a competitive solicitation conducted by the United States Department of Labor ("DOL") for network-infrastructure and operations-support services. Plaintiff, Systems Plus, Inc. ("Systems Plus"), an offeror in the solicitation, challenges DOL's award of a blanket purchase agreement ("BPA") to another offeror, intervening defendant NetStar–1, Inc. ("NetStar"). Systems Plus contests the award to NetStar on two bases: (1) that NetStar had an unfair competitive advantage that was neither recognized nor mitigated by the Contracting Officer in the solicitation, and (2) that in evaluating offerors' responses to the solicitation, DOL improperly deviated from the principles stated in the solicitation governing consideration of price. This bid protest is before the court on plaintiff's motion

for judgment upon the administrative record and defendant's and intervenor's cross-motions for judgment upon the administrative record.

Additionally, after this court had begun proceedings on this bid protest, DOL's contracting officer acted *sua sponte* and without notice to Systems Plus to disqualify Systems Plus from any further consideration even if it were to prevail in this action. Based upon that post-procurement, post-protest disqualification, defendant and intervenor have moved to dismiss plaintiff's case for lack of standing. Correspondingly, Systems Plus seeks judgment upon the administrative record that the Contracting Officer's decision to disqualify it from further consideration notwithstanding the outcome of this case should be set aside as arbitrary, capricious, or otherwise not in accordance with law.

A hearing on the pending motions and a trial on equitable issues were held on January 11, 2006. For the reasons set out below, the court vacates and sets aside the Contracting Officer's disqualification decision, grants plaintiff's motion for judgment in that regard, denies defendant's and intervenor's motions to dismiss for lack of standing, denies plaintiff's motion for judgment upon the administrative record regarding the procurement, and grants the government's and intervenor's cross-motions for judgment upon the administrative record as to the procurement.

## BACKGROUND

### A. The Solicitation

On April 20, 2005, DOL issued RFQ No. DOL059RQ20031 on Standard Form 1449 ("solicitation for commercial items") for the award of a Blanket Purchase Agreement ("BPA") to provide information-technology services for DOL's Office of the Assistant Secretary of Administration and Management, Information Technology Center ("ITC"). AR Tab 2 (Contracting Officer's

---

1. Because this decision might have contained "confidential or proprietary information" within the meaning of the Rules of the Court of Federal Claims ("RCFC") Appendix C, ¶ 4, and the protective order issued in this case on November 30, 2005, it was initially issued under seal. The

parties were requested to file redactions by February 27, 2006. *See infra,* at 775. The decision has been redacted and modified for publication. Redactions are represented by brackets enclosing asterisks "[* * * *]."

Statement of Facts) ¶ 1; AR Tab 5 (Solicitation) at 1.[2] The solicitation sought a supplier for a variety of services in support of the computing, telecommunication, and software functions in use at DOL. AR Tab 2 ¶ 2. This contractual award was designated as a small business set-aside. *Id.* ¶ 1. DOL invited approximately a dozen holders of existing GSA Federal Supply Schedule contracts to participate in the competition. AR Tab 2 ¶ 1, Tab 4 (Invitation letters to potential suppliers). At the time the RFQ was issued, DOL believed that each of these businesses qualified as a small business, although one of the businesses, Sytel, was later disqualified when DOL determined that it no longer satisfied the small-business criteria. AR Tab 2 ¶ 4. Plaintiff Systems Plus and intervening defendant NetStar were among those suppliers invited to participate. AR Tab 4 at 1–5. Systems Plus and NetStar had both performed work for DOL's ITC prior to the solicitation. Systems Plus had performed work for ITC for approximately seven years, and NetStar for approximately two years (as a subcontractor to another entity). AR Tab 1 (Agency Memorandum of Law, *Protest of Systems Plus, Inc.*, B–297253 (GAO Oct. 28, 2005)) at 1; Tr. 201:23 to 202:9 (Test. of Brij Koolwal, President and CEO, Systems Plus). Prior to the solicitation, Systems Plus was the incumbent supplier of many of the requirements to be covered by the BPA, including maintenance of operations support. Tr. 204:20 to 205:15 (Test. of Koolwal). DOL identified Systems Plus as the incumbent supplier during the solicitation process. *See* AR Tab 7 (Solicitation Amendment 0002, Additional Vendor Requests for Clarifications) at 2.

DOL contemplated that the BPA resulting from the RFQ would establish blanket contractual terms that would serve as the basis for discrete task orders. The solicitation stated that the BPA would be for a base period with four subsequent one-year options. AR Tab 2 ¶ 2, AR Tab 5 at I.7. Quotes

from prospective bidders were to contain a technical proposal, a business proposal, and information about the vendor's past performance. AR Tab 5 at II (Instructions, Conditions, and Notices to Bidders). "Technical proposals" were to consist of the following subparts: (I.) Understanding, (II.) Statement of Work, (III.) Performance Requirements Summary, (IV.) Qualifications and Availability/Commitment of Individual Staff, (V.) Institutional Experience, and (VI.) Project Management. *Id.* The "Statement of Work" and "Performance Requirements Summary" were intentionally left blank by DOL, with the intention that vendors would devise a statement of work and performance requirements based upon program objectives and a sample task order provided by DOL. AR Tab 5 at II, Attachment 2; AR Tab 7 (Vendor Requests for Clarifications) at 25. This "performance-based" procurement strategy was designed to encourage innovative proposals from bidders, as contrasted to a more traditional procurement in which all deliverables are explicitly identified by the contracting agency. Tr. 151:7 to 152:5.

"Business proposals" were to include financial data about the bidding company, as well as pricing information. The pricing data provided by a bidder was to show all of the bidder's labor categories and a "loaded hourly rate" for each category, broken out for the base period as well as for each of the optional periods. AR Tab 7 (Amendment 0001, Instructions for Preparing Business Proposals). Additionally, bidders were asked to provide a pricing proposal based upon the Sample Task Order described in the solicitation. This pricing proposal was to serve as a firm fixed-price requirement; *i.e.*, bidders had to explain the total cost of providing the desired tasks described in the sample task order. AR Tab 5 at Attachment 6; AR Tab 7 (Instructions for preparing Business Proposals); Tr. 152:6 to 155:1. "Past performance proposals" were to include references of three to five client organizations. AR Tab 5 at II.8.

---

**2.** "AR" refers to the Administrative Record filed with the Court. This record includes the documentation of DOL's solicitation of proposals and action on those proposals to award a BPA, plus the record of the post-award proceedings before the Contracting Officer and the Government Accountability Office ("GAO"). "Tr." ___ refers to the transcript of the hearing on the cross-motions for judgment upon the administrative record and trial of equitable issues conducted on January 11, 2006.

DOL indicated that the BPA was to be awarded under Federal Acquisition Regulation ("FAR") [48 C.F.R.] subpart 8.4 on a "best value" basis, taking into consideration the Technical, Past Performance, and Pricing/Business Proposal submissions. AR Tab 5 at III (Evaluation Criteria and Basis for Award (Best Value) under FAR subpart 8.4); AR Tab 7 (Vendor Requests for Clarifications) at 25. The solicitation specifically stated that DOL was not required to describe or identify the relative importance of the various evaluation factors in advance. DOL's responses to several questions from vendors stated that the procurement would be conducted using FAR Part 12, Commercial Items, which did not require the assignment of relative weight to the various evaluation factors. These responses were incorporated by reference into the solicitation. *See, e.g.,* AR Tab 7 (Vendor Requests for Clarifications) at 7, 25.

### B. DOL's Consideration of the Proposals

Five offerors submitted timely proposals in response to the RFQ: Systems Plus, NetStar, MilVets, Cascades Technologies, and Sytel. AR Tab 2 ¶ 4; AR Tab 13 (Technical Review Team Summary Report). NetStar was ultimately selected as the winner of the Contracting Officer's best-value determination. AR Tab 2 ¶ 15. In conducting his best-value determination, the Contracting Officer relied upon the three factors listed in the RFQ—Technical, Past Performance, and Pricing. AR Tab 16 (Determination of Best Value) at 1. The Contracting Officer indicated that there was no particular "weight" assigned to these factors, and that these factors could vary in importance. For example, "[a]s ... competing offeror proposals in the Technical areas become more equal in rating, the more important Price will become." *Id.*

The "technical proposals" were first evaluated by a five-person team, and thereafter the results of this review were forwarded to the Contracting Officer for review during the best-value determination. *See* AR Tab 13 (Technical Review Team Summary Report), Tab 16 (Determination of Best Value). The five-member technical review team rated each bidder's technical proposals under

eight different categories: Understanding, Capabilities, Program Management, Institutional Experience, Transition Plan, Statement of Work, Sample Task Order, and Performance Requirements. *See* AR Tab 13 (Technical Review Team Summary Report). In this initial evaluation of technical proposals, NetStar was rated second behind Sytel and Systems Plus was rated fifth. *Id.* After the initial review was completed, offerors were notified of their weaknesses through clarification letters, which DOL sent to offerors on July 14, 2005. AR Tab 10 (Clarification Letters). DOL requested that vendors respond by July 19, 2005. *Id.* Vendors supplied the requested responses. AR Tab 11 (Systems Plus Clarifications), Tab 12 (NetStar Clarifications), Tab 16 (Determination of Best Value). Sytel was eliminated from the competition and was not included in the final evaluations because DOL determined that Sytel no longer qualified as a small business. Tab 18 (Letter from John Huotari, DOL Contracting Officer, to Jeanette Lee White, President, Sytel (Sept. 7, 2005)); *see* AR Tab 16 (Determination of Best Value). Based upon the original ratings and the vendor responses, the technical evaluation team provided a final rating of the technical proposals on August 2, 2005. AR Tab 13 (Technical Review Team Summary Report on Vendor Initial proposal and Additional Responses). NetStar was rated first and Systems Plus was rated second. *Id.* The Contracting Officer used the results of the final review of the technical proposals in the final best-value determination. AR Tab 16 (Determination of Best Value).

In rendering a final decision, the Contracting Officer also relied upon a summary of "past performance" data that was provided to DOL by offerors' prior clients. AR Tab 16 (Determination of Best Value) at 3. DOL received a limited number of these past-performance evaluation forms for each bidder, and the responses tended to be descriptive and anecdotal. *See id.* The Contracting Officer accordingly did not assign bidders a numerical rank. *See id.* According to the Determination of Best Value, DOL received two past-performance responses with respect to NetStar; NetStar received one "exceptional" rating and one "satisfactory" rating.

*Id.* DOL received one past-performance response relating to Systems Plus; this rating was "satisfactory." *Id.*

Price was the third factor considered by the Contracting Officer during the best-value determination. The Contracting Officer reviewed pricing on two bases: (1) offerors' bids on the sample task order, and (2) each offeror's labor rates by job function. AR Tab 16 at 1–2. Systems Plus's estimated price for the sample task order was $1,263,085.70, the lowest of those submitted. *Id.* at 1. NetStar's price, [* * * *], was the third lowest of all offerors, higher than both Systems Plus and MilVets. *Id.* The Contracting Officer, however, indicated that he believed that the lump-sum pricing provided by offerors for the sample task order could have been easily manipulated by offerors to obscure the real, long-term cost structure that the offerors would provide. *Id.* at 1–2. The Contracting Officer accordingly focused on the labor category rates put forward by each offeror. In the Determination of Best Value, he stated:

> The task order pricing was determined not to be a credible indication of the total costs for the 5 years. . . . Because this task order is only one of many task orders to be issued against this [BPA], the CO determined that to more accurately determine a fair and reasonable price for the whole 5 years, that each individual labor category rate should be evaluated as well. To do this, the CO . . . took all the labor category rates identified in the solicitation, and added them up to come up with a total hourly rate, then this was divided by . . . the number of labor categories identified in the [RFQ]. This figure was the average hourly rate. The average hourly rate for the base and all option [years] were added, and then divided by five to come up with the average five year hourly rate.

AR Tab 16 at 1. Using this methodology, the Contracting Officer determined that NetStar had the lowest arithmetic "average" hourly

rates across all job functions. *Id.* at 2. The Contracting Officer appears to have relied on these averages to assign rankings to the offerors' overall pricing proposals, concluding that "[r]ates are . . . more important than a creatively prepared task order." *Id.* By this measure, Systems Plus was third, behind both NetStar and MilVets. *Id.*

Based upon the evaluations of technical and price proposals, as well as the past performance data, the Contracting Officer determined that NetStar represented the best value to the government and therefore should be awarded the BPA. AR Tab 16 at 2. The BPA between NetStar and DOL, designated contract GS–35F–0072N, was executed on September 6, 2005. AR Tab 17(BPA). The non-winning bidders, including Systems Plus, were issued letters informing them of DOL's decision on September 7, 2005. *See* AR Tab 19 (Letter from Houtari to Koolwal (Sept. 7, 2005)).

### C. Post–Award Proceedings

Systems Plus filed a protest of the BPA award with GAO on September 19, 2005, claiming that NetStar had benefitted from an organizational conflict of interest at DOL. Amended Complaint ("Am.Compl.") ¶ 6; AR Tab 20 (Letter from Robert Tate, Counsel for Systems Plus, to Susan McAuliffe, GAO (Sept. 19, 2005)). Systems Plus filed a supplemental complaint with GAO on September 30, 2005, claiming that NetStar should have been ineligible for the contract because NetStar was improperly performing as a subcontractor with respect to another firm's contract with DOL. *See* AR Tab 20 (Letter from Tate to McAuliffe (Sept. 30, 2005)).[3] On November 17, 2005, GAO dismissed Systems Plus's protest on a technical ground affecting GAO's jurisdiction, without reaching the merits. *Id.* ¶ 8; AR Tab 53 (Decision, *Matter of Systems Plus, Inc.*, B–297253 (GAO Nov. 17, 2005)) (dismissing Systems Plus's bid protest because Systems Plus missed a 5:30 p.m. filing deadline: "Our fac-

---

**3.** Shortly thereafter, on October 11, 2005, Systems Plus filed an action in this court, seeking imposition of a stay of NetStar's performance pending resolution of Systems Plus's GAO protest. Am. Compl. ¶ 7; *see Systems Plus, Inc., v. United States*, No. 05–1076C (Fed.Cl. filed Oct.

11, 2005). On October 27, 2005, Judge Bruggink of this court denied the injunctive relief sought by Systems Plus and dismissed the complaint requesting a stay. *See Systems Plus, Inc., v. United States*, 68 Fed.Cl. 206, 211 (2005).

simile machine activity reports indicate that the initial transmission to our Office had not commenced until 5:30 p.m. and that it took approximately 5 minutes to complete.")

Systems Plus filed the current action in this court on November 21, 2005. Subsequent to the filing of this case, NetStar was granted leave to intervene as a defendant. Order of Nov. 30, 2005. After proceedings in this action were underway, *i.e.,* after an initial conference had been held and an expedited schedule for briefing, hearing and trial had been entered by this court, on December 9, 2005 a new Contracting Officer, Valerie L. Veatch, *sua sponte* determined that Systems Plus would be ineligible to compete in any corrective competition that might be ordered as a result of this case. AR Tab 55 (DOL Contracting Officer's Determination & Findings (Dec. 9, 2005)). The Contracting Officer based this decision on her investigation into the appearance at Systems Plus's offices of a sensitive procurement document containing some of NetStar's pricing data. *Id.* ¶¶ 9, 18–19. She determined that this event had created an appearance of impropriety that required the disqualification of Systems Plus from any further consideration. *Id.* ¶¶ 18–19. Subsequent to the Contracting Officer's post-award, post-protest disqualification determination, the government and NetStar both filed motions to dismiss, claiming that Systems Plus was no longer an interested party and thus lacked standing as a result of its disqualification. Systems Plus correspondingly amended its complaint and filed a motion to have the Contracting Officer's determination set aside.

## ANALYSIS

Systems Plus alleges that DOL improperly evaluated Systems Plus's proposal by conducting a flawed pricing analysis in violation of applicable statutes and regulations, and that NetStar should have been ineligible to receive the award of the BPA because of an organizational conflict of interest. The BPA awarded to NetStar by DOL consists of a five-month base period and four one-year options; Systems Plus requests that the court bar DOL from exercising its option to renew the BPA with NetStar and require

DOL to re-solicit the BPA. The government and NetStar have filed cross-motions for judgment on the administrative record as to the procurement decision, and, as noted earlier, they have also moved to dismiss Systems Plus's complaint on the basis that the Contracting Officer's decision to disqualify Systems Plus deprives Systems Plus of standing. *See* Defendant's Motion to Dismiss with Prejudice for Lack of Subject Matter Jurisdiction ("Def.'s Standing Mot."); Intervenor's Motion to Dismiss for Lack of Standing ("Int.'s Standing Mot."). Systems Plus seeks judgment on the administrative record that the Contracting Officer's decision to disqualify plaintiff from further competition should be set aside as arbitrary, capricious, or otherwise not in accordance with law. *See* Plaintiff's Supplemental Motion for Judgment on the Administrative Record as to Count Seven of the First Amended Complaint ("Pl.'s Standing Mot."); Memorandum in Support of Pl.'s Standing Mot. ("Pl.'s Standing Mem.").

### A. Jurisdiction and Standing

This is a post-award bid protest. The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320, § 12(a), 110 Stat. 3870, 3874–75 (Oct. 19, 1996) (codified at 28 U.S.C. § 1491(b)), provides that this court "shall have *jurisdiction* to render judgment *on an action by an interested party objecting* to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or *the award of a contract* or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (emphasis added). This statute further provides that this court "shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded." *Id.* These provisions provide this court with jurisdiction over both pre– and post-award bid protests. *See American Fed'n of Gov't Employees, AFL–CIO v. United States,* 258 F.3d 1294, 1300 (Fed.Cir.2001); *RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1289 (Fed. Cir.1999). This post-award bid protest case falls squarely within the ambit of Section 1491(b)(1), and therefore the court has sub-

ject-matter jurisdiction to adjudicate System Plus's claims in this case if Systems Plus can establish that it has standing in this procurement.

■ Defendant and NetStar have challenged Systems Plus's standing based upon the Contracting Officer's disqualification of Systems Plus on December 9, 2005. *See* AR Tab 55 (Contracting Officer's Determinations & Findings). To establish standing, a protester must establish that it is an "interested party" and that it has been prejudiced by the pertinent agency's procurement action. *See Park Tower Mgmt., Ltd. v. United States,* 67 Fed.Cl. 548, 557–59 (2005) (quoting 28 U.S.C. § 1491(b)(1)). The Court of Appeals for the Federal Circuit has interpreted the term "interested party" to have the same meaning as that term is given in the Competition in Contracting Act, 31 U.S.C. § 3551. *See Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1351–52 (Fed.Cir.2004).[4] In *Banknote,* the Federal Circuit held that the interested parties who may invoke this court's bid protest jurisdiction are " 'limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.' " *Id.* at 1352 (quoting *American Fed'n of Gov't Employees,* 258 F.3d at 1302).

**4.** 31 U.S.C. 3551(2)(A) states that "[t]he term 'interested party,' with respect to a contract or a solicitation or other request for offers . . . , means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."

**5.** The Contracting Officer's Determination & Findings of December 9, 2005 were not a part of the original administrative record filed by the government on December 2, 2005. NetStar filed a *motion to supplement the administrative* record with the Determination & Findings on December 16, 2005. "As a practical matter . . . in most bid protests, the administrative record is something of a fiction, and certainly cannot be viewed as rigidly as if the agency had made an adjudicative decision on a formal record that is then certified for court review." *International Res. Recovery, Inc. v. United States,* 59 Fed.Cl. 537, 541 (2004). Nonetheless, the starting point for judicial action in a protested procurement should be the contemporaneous administrative record of the agency's action. *See Camp v. Pitts,*

The government and NetStar claim that Systems Plus does not qualify as an "interested party" because the Contracting Officer disqualified Systems Plus from any further consideration for award of this contract. Def.'s Standing Mot. at 2–3; Int.'s Standing Mot. at 8. NetStar makes the related argument that a party that is disqualified also cannot be deemed to have been prejudiced. Int.'s Standing Mot. at 8. Systems Plus asks this court to reject the contentions of the government and NetStar on the grounds that the decision of the Contracting Officer to disqualify Systems Plus was arbitrary, capricious, or otherwise not in accordance with law, and lacked a reasonable factual basis. Pl.'s Standing Mem. at 19–39.

Whether Systems Plus qualifies as an interested party is an issue that must be resolved at the outset. There is no dispute that Systems Plus was a strong contender for the BPA and thus would be an "interested party" absent the belated disqualification decision. The court thus initially addresses the propriety of the Contracting Officer's disqualification decision. The Contracting Officer acted based upon her investigation of a procurement-sensitive document that came to be in the possession of a lawyer who was then acting as counsel for Systems Plus. AR Tab 55 (Contracting Officer's Determination & Findings).[5] This document constituted an

411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1338 (Fed.Cir.2001). Gaps in the administrative record may exist largely because of the informal nature of the agency's action. *See J.C.N. Constr. Co. v. United States,* 60 Fed.Cl. 400, 404–05 n. 8 (2004) (citing *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989)), *aff'd,* 122 Fed.Appx. 514 (Fed. Cir.2005).

Although the Contracting Officer's disqualification of Systems Plus from further competition arguably is not relevant to DOL's decision on the procurement, it is critically important to a decision by this court regarding its jurisdiction to proceed to the merits of this action. Thus, for jurisdictional purposes, the court will include the disqualification in the record of this action.

Separately, the government requested that the court supplement the Administrative Record with three documents, to be designated as Tabs 56, 57, and 58. *See* Defendant's Motion to Supplement the Administrative Record ("Def.'s Mot. to Supplement"), filed on December 23, 2005. The government proffers these documents to show

extract, dated April 29, 2005, from a proposal made to DOL in a separate procurement, which extract set out the names of some of NetStar's employees and the rates to be charged by NetStar for these employees' services. *See id.* ¶ 7. When DOL was informed that Systems Plus's counsel had received the document, DOL referred the matter to its Office of Inspector General ("OIG") on October 25, 2005. *See id.* ¶ 8. After a brief investigation, the OIG informed agency counsel on November 17, 2005 that it would take no action on the referral, but the OIG made no findings of fact on the matter. *See* AR Tab 61 (E-mail correspondence between Dennis Adelson, DOL Agency Counsel, and David Hunter, Assistant Counsel to DOL's Inspector General (Nov. 30, 2005)), Tab 63 (Memorandum from Adelson to Gordon Heddell, DOL's Inspector General (Oct. 25, 2005)).

The manner in which Systems Plus came into possession of the document is disputed. A declaration of a Systems Plus employee (Ms. Sai, Vice President of Systems Plus), stated that the document was discovered in a sealed envelope by a Systems Plus employee at Systems Plus's office suite on a Saturday morning, September 24, 2005, that the envelope indicated that it was directed to an attorney then representing Systems Plus, and that the document was conveyed unopened to that attorney on September 26, 2005. *See* AR Tab 39 (Letter from David Kasanow and Thomas Papson, counsel for Systems Plus, to Adelson (Oct. 21, 2005), Declaration of Yea Lin Sai (Oct. 20, 2005)). The receiving attorney stated in a declaration that his perusal of the document was only for purposes of identifying the document and that he discussed the documents with Systems Plus employees only for the purpose of confirming that the document referred to NetStar employees. AR Tab 39 (Declaration of Robert Tate (Oct. 20, 2005)). Counsel for Systems Plus returned the documents, along with the declarations of Ms. Sai and Mr. Tate, to DOL on October 21, 2005. AR Tab 39 (Letter from Kasanow and Papson to Adelson).

Notwithstanding the declarations of Ms. Sai and Mr. Tate, the Contracting Officer speculated that the document could have been available to Systems Plus in May 2005 before Systems Plus submitted its proposal on the RFQ; the Contracting Officer opined that knowledge of the contents of these documents could have given Systems Plus an unfair advantage in the procurement. AR Tab 55 ¶¶ 9–11, 16. As she said, "I strongly suspect that a Systems Plus employee took the document from within DOL and brought it to the Systems Plus corporate offices." *Id.* ¶ 11. The Contracting Officer theorized that because the extract showing some of NetStar's labor rates was originally created on April 29, 2005, Systems Plus could have received and used the information to formulate the rates it provided in its initial proposal of May 23, 2005 or in its revised proposal of July 19, 2005. *Id.* ¶ 16. The Contracting Officer further noted that although the labor

that plaintiff had access to pre-bidding information similar to that possessed by NetStar. The three documents thus relate to System Plus's claim that NetStar was privy to information that created an organizational conflict of interest. The court deems it appropriate to supplement the Administrative Record with these documents. *See* AR Tab 56 (Contract No. DOLJ059610725 (Sept. 30, 2004)), Tab 57 (Task Order DOLB059620732 (Mar.2, 2005)), Tab 58 (Contract No. DOLJ059610724 (Sept. 30, 2004)).

Systems Plus also submitted motions to supplement the Administrative Record on December 16, 2005 and January 5, 2006. The motion of December 16, 2005 requests supplementation of the administrative record with a declaration of Brij Koolwal relating to potential harm to plaintiff. The court grants the motion on the ground that the proffered declaration relates to equitable issues. Plaintiff's motion of January 5, 2006 proffers five documents that relate to the Con-

tracting Officer's decision to disqualify Systems Plus from further consideration. The court grants this motion by plaintiff because these documents bear on the court's jurisdiction.

The court is well aware of the possibility that supplementary declarations and testimony at trial may reflect wisdom gained by hindsight and may not represent individuals' actual bases for making decisions during the procurement. Notably, "[i]n examining this expanded record, this [c]ourt is mindful that it must critically examine any *post hoc* rationalization." *PGBA, LLC v. United States,* 60 Fed.Cl. 196, 204 (2004) (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 549, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Co-Steel Raritan, Inc. v. International Trade Comm'n,* 357 F.3d 1294, 1316 (Fed.Cir.2004)), *aff'd,* 389 F.3d 1219 (Fed.Cir.2004).

categories in Systems Plus's initial proposal did not correspond exactly with those listed in the NetStar document, Systems Plus's rates were lower than NetStar's rates in 12 of 16 RFQ categories. *Id.* The Contracting Officer also relied upon an e-mail message from DOL's counsel, Dennis Adelson, to contradict the statement of Ms. Sai regarding the timing of the discovery of the document; Mr. Adelson's account described an episode in which he attempted and failed to enter Systems Plus's offices on a Saturday in an apparent effort to determine whether a non-Systems Plus employee could have gained access to "plant" the documents. *See* AR Tab 55 ¶ 12; AR Tab 62 (E-mail from Adelson to Huotari (Dec. 5, 2005)). The Contracting Officer stated that she could not prove that any Systems Plus employee was responsible for the delivery of the document to the offices of Systems Plus, that she could not determine whether Systems Plus had access to the document before it submitted its proposals, and that she could not determine if the sensitive information in the document was actually made available to Systems Plus and used in this procurement. *See* AR Tab 55 ¶¶ 11–13, 16, 18. However, based on suspicion, speculation, and inferences, she determined that even if Systems Plus had gained no actual advantage, the matter created "the appearance of impropriety" and damaged the integrity of the procurement process. *Id.* ¶¶ 17–18. Relying on FAR §§ 9.504 (stating that it is a Contracting Officer's duty to be concerned with conflicts of interest), 5.401 (regarding the Contracting Officer's responsibility to preserve the integrity of the acquisition process), 3.101–1 (requiring that government business "be conducted in a manner above reproach"), and

3.104–4 (prohibiting the disclosure of contractor proposal information to unauthorized persons), the Contracting Officer stated that Systems Plus had to be disqualified "to mitigate the effects of this appearance of impropriety." AR Tab 55 ¶¶ 17, 19.[6]

This court's review of an agency's decision regarding a contractual solicitation or award is governed by the standards prescribed in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.[7] Under Section 706, a reviewing court should set aside agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This court should overturn a procurement decision only where "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni*, 238 F.3d at 1332; *see also Gentex Corp. v. United States*, 58 Fed.Cl. 634, 648 (2003). An agency's decision can be "found to be arbitrary and capricious" where "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Keeton Corrs., Inc. v. United States*, 59 Fed.Cl. 753, 755 (2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). In evaluating an agency's findings, "the court 'is not empowered to substitute its judgment for that of the agency.'" *Keeton Corrs.*, 59 Fed.Cl. at 755 (quoting *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814). Rather, the court "must look to

---

6. FAR § 3.104–4 has a counterpart in, and implements, the Procurement Integrity Act, Pub.L. No. 100–679, § 6, 102 Stat. 4063–69 (Nov. 17, 1988) (codified, as amended, at 41 U.S.C. § 423), which, among other things, bars a bidder on a federal contract from "knowingly obtain[ing] contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 423(b). The parties have not suggested that this statutory prohibition was contravened. *See Pikes Peak Family Housing, LLC v. United States*, 40 Fed.Cl. 673, 681 (1998) (Section 423 is "directed at situations in which a present or former government procurement officer secretly leaks information concerning a pending solicitation to an offeror participating therein, in the hopes of securing post-government employment or other compensation from said offeror.").

7. This Court's jurisdiction over this case rests upon 28 U.S.C. § 1491(b)(1). By statute, "[i]n any action under this subsection [*i.e.*, § 1491(b)], the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4).

see whether the agency considered the relevant factors and made a rational determination." *Keeton Corrs.*, 59 Fed.Cl. at 755 (citing *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir. 2000)). Applying this standard, the court finds that the Contracting Officer's disqualification decision was improper on three separate and independent grounds—the disqualification was procedurally flawed, it lacked a rational basis, and it constituted an improper *post hoc* attempt to remove System Plus's protest from this court's jurisdiction and thus insulate DOL's procurement decision from review.

■ First, the Contracting Officer's decision was procedurally flawed to the point that it was contrary to law. Her investigation and consideration of the matter did not provide any notice to Systems Plus or opportunity for Systems Plus to be heard. Systems Plus was unaware that the Contracting Officer was addressing Systems Plus's alleged access to the NetStar information until the disqualification decision was rendered on December 9. Tr. 68:5 to 69:10. Manifestly, Systems Plus was provided no opportunity to address or to contest the Contracting Officer's suspicions. Because the Contracting Officer's determination was not rulemaking or an on-the-record adjudication as defined by the APA, it falls within the category of informal agency adjudication.[8] Section 555 of the APA establishes rudimentary "procedural requirements for informal adjudication." *Advanced Sys. Tech., Inc. v. United States,* 69 Fed.Cl. 474, 484 (2006) (citing *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990), and quoting Ronald J. Krotoszynski, *Taming the Tail That Wags the Dog: Ex Post and Ex Ante Constraints on Informal Adjudication,* 56 Admin. L.Rev. 1057, 1059 (2004) ("[T]he Supreme Court has held that § 555 of the APA provides the APA's proce-

dural blueprint for informal adjudications.") (citing *Pension Benefit,* 496 U.S. at 655, 110 S.Ct. 2668)). Section 555(b) of the APA provides, in pertinent part, that a party is entitled to be heard in an agency proceeding, absent exigent circumstances:

> *A party is entitled to appear in person or by or with counsel* or other duly qualified representative *in an agency proceeding.* So far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function.

5 U.S.C. § 555(b) (emphasis added). The Supreme Court in *Pension Benefit* indicated that a party's entitlement to the protections afforded by Section 555 corresponds to procedural due process. 496 U.S. at 655–56, 110 S.Ct. 2668. In that respect, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)); *see also* Henry J. Friendly, *Some Kind of Hearing,* 123 U. Pa. L.Rev. 1267 (1975). Here, the Contracting Officer did not provide Systems Plus with *any* such opportunity, nor did applicable statutes or exigent circumstances curtail an opportunity to be heard. In short, the Contracting Officer's action contravened "the minimal requirements" for informal adjudication set forth in Section 555 of the APA. *Pension Benefit,* 496 U.S. at 655, 110 S.Ct. 2668. Therefore, the Contracting Officer's disqualification decision is invalid under Section 706(2)(A). *See Impresa Construzioni,* 238 F.3d at 1332.[9]

---

8. *See* 5 U.S.C. §§ 551(5) ("rule making" means agency process for formulating, amending, or repealing a rule), 551(7) ("adjudication" means agency process for the formulation of an order). *See also* 5 U.S.C. § 554(a) ("[T]his section applies ... in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing.").

9. The government has not contended that exigent circumstances or other aspects of "the orderly conduct of public business" either required that the disqualification proceedings proceed on an *ex parte* basis or prevented giving Systems Plus notice and an opportunity to be heard. *Cf. Advanced Sys. Tech.,* 69 Fed.Cl. at 484 (" '[T]he affirmative grant of the right to appear apparent-

Second, in contravention of Section 706(2)(A), the Contracting Officer also lacked a rational basis for her decision. In defending the Contracting Officer's action, the government and NetStar rely on *NKF Engineering, Inc. v. United States*, 805 F.2d 372 (Fed.Cir.1986), for the proposition that the Contracting Officer's finding of an appearance of impropriety provided a rational basis for her decision to disqualify Systems Plus. Def.'s Standing Mot. at 4–5; Int.'s Standing Mot. at 9–10. In *NKF Engineering*, the Federal Circuit upheld a contracting officer's decision to disqualify a government contractor due to the appearance of impropriety. 805 F.2d at 378. The appearance of impropriety in that case resulted from a substantial decrease in the contractor's bid after the contractor hired a former technical representative of the contracting officer who had inside knowledge about the procurement and the contracting agency's evaluation criteria. 805 F.2d at 374–75. The Federal Circuit upheld the contracting officer's decision to disqualify the contractor, determining that the decision was "not arbitrary or capricious, unreasonable or irrational." *Id.* at 378. In *NKF Engineering*, however, the Federal Circuit did not enshrine unlimited discretion on the part of contracting officers to disqualify bidders based upon an appearance of impropriety. To the contrary, the Federal Circuit explicitly stated that review of a contracting officer's decision to disqualify a bidder based on an appearance of impropriety must be based "upon the circumstances in each case." *Id.* at 376; *see also Joseph L. DeClerk & Assoc., Inc. v. United States*, 26 Cl.Ct. 35, 44 (1992).

In the case at hand, some facts material to the Contracting Officer's decision were demonstrably erroneous and other aspects of her decision have no basis apart from speculation and innuendo. For example, the Contracting Officer accepted the assertion of the agency counsel, Mr. Adelson, that Systems Plus's office building was locked to non-Systems Plus employees on Saturday, including by inference the Saturday on which a Systems Plus employee, Ms. Sai, said she discovered the sensitive document. *See* AR Tab 55 ¶ 12. Mr. Adelson's statement led the Contracting Officer to discount the assertions of the Systems Plus employees and fueled her suspicion of Systems Plus's integrity. *See id.* ¶ 12. However, a subsequent declaration of Systems Plus's president and CEO and a memorandum from the property manager of Systems Plus's building contravene Mr. Adelson's assertion about the closure of the building. AR Tab 60 (Second Declaration of Brij Koolwal (Jan. 4, 2006)), Ex. 1 (Mem. from Keith Miller, Property Manager, Rickman Piccard LLC, to Systems Plus (undated)). According to these submissions, Systems Plus's building is open from 8:00 a.m. until noon on Saturdays. AR Tab 60 Ex. 1. Even though the appearance of impropriety can be a valid reason for disqualifying an offeror, *see NKF Engineering*, 805 F.2d at 376–78, the appearance of impropriety must be based on actual facts. Here, the Contracting Officer had no factual predicate for her disqualification determination, and thus it cannot be sustained.

Third, the actions of the Contracting Officer constituted a *post hoc* endeavor to remove or elide this court's jurisdiction to hear this case. The Contracting Officer rendered her decision only because of the pendency of this action, stating that "because my decisions may affect the pending court case, I am making that determination [which offerors should be allowed to compete in any corrective competition] now rather than wait for eventualities to occur." AR Tab 55 ¶ 3. This litigation-motivated contrivance by a contracting officer does not deserve any deference from this court. *See Citizens to Preserve Overton Park*, 401 U.S. at 420, 91 S.Ct. 814; *see also Parker v. Office of Pers. Mgmt.*, 974 F.2d 164, 166 (Fed.Cir.1992) (post-hoc rationalizations by "a line official who is trying to justify [the agency's] position" are no different in substance than "appellate counsel rationalizing an agency action.... The same result obtains: post-hoc rationalizations will not create a statutory interpretation deserving of deference."). Once this court has been

---

ly bestowed by section 555(b) is not blindly absolute, without regard to the status or nature of the proceedings and concern for the orderly conduct of public business.' ") (quoting *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1484 (Fed. Cir.1986)).

accorded jurisdiction over an action, events may occur which moot the controversy. However, those events may not be manufactured by the defending agency solely for the purpose of divesting the court of its juridical power. *Cf. Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990) (statute did not "empower the Secretary [of Labor] to regulate the scope of judicial power vested by the statute"); *Federal Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 745, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973) ("an agency may not bootstrap itself into an area where it has no jurisdiction").

In short, for the three separate and independent reasons stated above, the Contracting Officer's post-procurement, post-award disqualification of Systems Plus must be set aside.

■ That determination does not end the standing inquiry, however. To show standing, Systems Plus must establish that it has been "prejudiced" by DOL's procurement process. *See Park Tower Mgmt.*, 67 Fed.Cl. at 559. "Since 'the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.'" *Id.* (quoting *Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir.2003)). "To establish prejudice, [the protestor] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Information Tech.*, 316 F.3d at 1319 (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir. 1999)). "In other words, the protestor's chance of securing the award must not have been insubstantial." *Id.* (citing *American Fed'n of Gov't Employees*, 258 F.3d at 1302; *Impresa Construzioni*, 238 F.3d at 1334). Systems Plus was a qualified small-business bidder on this procurement. DOL's evaluation determined that Systems Plus's response was "technically acceptable." *See* AR Tab 16 at 5. Additionally, Systems Plus submitted the lowest bid on the "sample task order," and its "average" hourly labor rate, as calculated by the Contracting Officer, was only 3.5% higher than NetStar's "average" hourly rate. *Id.* at 1–2. Systems Plus was also the incumbent supplier on many of the deliverables required by the BPA, thereby demonstrating that the company would likely have been capable of performing under the contract if it had been awarded. *See* AR Tab 7 (Additional Vendor Requests for Clarifications) at 2. Systems Plus's proposal was "fully within the zone of consideration for a contractual award." *PGBA*, 60 Fed.Cl. at 207–08 (being within the "zone of consideration" is a factor that tends to show that a bidder was prejudiced); *see also Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1331 (Fed.Cir.2004) (favorable reviews by agency evaluators and demonstrated competence to execute the demands of the procurement indicate that a bidder had a reasonable prospect of receiving a contract). In short, Systems Plus has shown sufficient prejudice to provide standing to pursue this post-award bid protest.

## B. Standards for Decision

■ To prevail in a bid protest, the protestor must show that the procuring agency acted without a rational basis or contrary to law and that the error prejudiced the offeror's posture in the procurement process. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed.Cir.2005); *see also Advanced Data Concepts*, 216 F.3d at 1057 (citing *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996)). Prejudice thus frequently is addressed at two separate stages of a bid protest, first in analyzing whether the protestor has standing to pursue its claims and then near the end of the analytical process in determining whether the protestor is entitled to relief. The second analytical step has also been described as follows: "for [plaintiff] to prevail it must establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996). The court first addresses the propriety of DOL's actions in the procurement, then turns to the issue of prejudice to Systems Plus.

## C. Alleged Errors in the Solicitation Process

### 1. Systems Plus's organizational conflict of interest ("OCI") claim.

Systems Plus avers that areas in which NetStar achieved higher ratings from evaluators related primarily to "NetStar's superior understanding and articulation of DOL's network architecture, objectives, and requirements for the future." Am. Compl. ¶ 67. Systems Plus claims that NetStar had an unfair advantage in preparing its proposal with regard to network architecture and infrastructure because NetStar had done recent work with ITC in designing its information technology infrastructure and planning. *Id.* As Systems Plus would have it, performing this work gave NetStar access to "nonpublic" information which gave NetStar an advantage *vis-a-vis* Systems Plus. *Id.*

█ To prevail on its OCI claim, Systems Plus must establish a violation of statutory or regulatory provisions relating to conflicts of interest. *See Galen Med. Assocs.*, 369 F.3d at 1335 (citing 18 U.S.C. § 208; 5 C.F.R. § 2635.403(c) (2003); 48 C.F.R. §§ 1–18 (2003)). Circumstances that create potential conflicts of interest are identified and addressed in FAR subpart 9.5, which instructs agencies to identify potential OCIs "as early in the acquisition process as possible" and to "[a]void, neutralize, or mitigate significant conflicts" before a contract is awarded so as to prevent an unfair competitive advantage. FAR § 9.504(a); *see Matter of Greenleaf Constr. Inc.*, B–293105.18, B293105.19, slip op. at 11–12, 2006 WL 249626 (GAO Jan. 17, 2006) (citing FAR §§ 9.501, 9.504, 9.505). "The responsibility for determining whether a contractor has a conflict of interest and should be excluded from competition rests with the contracting officer, who must exercise 'common sense, good judgment and sound discretion' in assessing whether a significant potential conflict exists and in developing appropriate ways to resolve it." *Matter of Greenleaf Constr., Inc.*, slip op. at 12 (citing FAR §§ 9.504, 9.505); *Matter of Aetna Gov't Health Plans, Inc.*, B–254397 et al., 95–2 CPD ¶ 129, 1995 WL 449806, at *8–9 (GAO July 27, 1995). The solicitation itself stated that "[i]t is [DOL]'s policy to avoid

situations in the procurement process where, by virtue of work or services performed for DOL, or as the result of data acquired from DOL a particular [offeror] [i]s given unfair competitive advantage over the [competing] companies in respect to future DOL business[, or] [i]s placed in a position to affect Government actions under circumstances in which there is danger that the [offeror] company's judgment may be biased." AR Tab 5 (Solicitation) at I.39.A–B. As a consequence, to succeed on its OCI claim, Systems Plus must show that DOL failed to comply either with the FAR OCI requirements or the terms of the solicitation itself.

FAR subpart 9.5 describes three basic situations in which organizational conflicts of interest arise. *See generally* Daniel I. Gordon, *Organizational Conflicts of Interest: A Growing Integrity Challenge,* 35 Pub. Cont. L.J. 25, 32 (2005) ("based largely on the language in FAR subpart 9.5, the case law has divided OCIs into three groups—referred to as 'biased ground rules,' '[u]nequal access to information,' and 'impaired objectivity' "). GAO's decision in *Matter of Aetna Government Health Plans* further defines these three categories, one of which is most pertinent to System Plus's claims:

> Th[is] ... group consists of situations in which a firm has access to nonpublic information as part of its performance of a government contract and where that information may provide the firm a competitive advantage in a later competition for a government contract. FAR § 9.505–4. In these "unequal access to information" cases, the concern is limited to the risk of the firm gaining a competitive advantage; there is no issue of bias.

*Matter of Aetna Gov't Health Plans, Inc.,* 1995 WL 449806, at *8. The court will address Systems Plus's claims within this framework.

█ With regard to whether an offeror has "unequal access to information," "[p]revious GAO decisions have held that 'the disclosure of information to equalize competition is an appropriate alternative to eliminating an offeror from a competition due to prior disclosure of information that could result in an

unfair competitive advantage." ' *Sierra Military Health Servs., Inc. v. United States,* 58 Fed.Cl. 573, 583 (2003) (quoting *Matter of Cowperwood Co.,* B–274140.2, 96–2 CPD ¶ 240, 1996 WL 738440 (GAO Dec. 26, 1996)). Incumbent status, without more, typically does not constitute "unequal access to information" for purposes of showing an OCI. *See Gulf Group, Inc. v. United States,* 56 Fed.Cl. 391, 398 & n. 13 (2003) ("[W]hile an agency may not unduly tip the scales in favor of an incumbent, it certainly may weigh the competitive advantages offered by that incumbent via its relevant experience and performance with the contract subject matter."); *Winstar Commc'ns, Inc. v. United States,* 41 Fed.Cl. 748, 763 (1998) (citing *Matter of Versar, Inc.,* B–254464.3, 94–1 CPD ¶ 230, 1994 WL 120013, at *7 (GAO Feb. 16, 1994)) ("[A]n offeror's competitive advantage gained through incumbency is generally not an unfair advantage that must be eliminated.").

■ The parties suggest that a proper template for determining whether an offeror's incumbency creates an "unequal access to information" can be found in *Matter of Johnson Controls World Services, Inc.,* B–286714.2, 2001 CPD ¶ 20, 2001 WL 122352 (GAO Feb. 13, 2001). *See, e.g.,* Plaintiff's Memorandum in Support of Motion for Judgment on the Administrative Record ("Pl.'s Judgment Mem.") at 11; Defendant's Cross-Motion for Judgment on the Administrative Record and Opposition to Plaintiff's Motion ("Def.'s Judgment Mot.") at 7–8. In *Johnson Controls,* the Comptroller General determined that a contract awardee suffered from an OCI because the awardee was "embedded" within the agency prior to the solicitation such that the awardee was "in the unique position of both having access to information to which no other offeror had access, and being involved in the management of the [facility's] support activities and the [agency's] installation support activities generally." 2001 WL 122352, at *5. The RFP distributed to prospective bidders in that case provided the number of weapons at the relevant military installation, as well as the total number of repairs to weapons that were conducted at that installation during the year. *Id.,* at *4. By contrast, the incumbent supplier had access to a database that provided much more detailed information, including the exact number of each weapon that was on the base as well as the exact part that was used to repair each weapon. *Id.,* at *4–5. This disparity in information was found to create an unfair advantage. *Id.,* at *4–6.

In support of its "unequal access to information" claim, Systems Plus states that NetStar was the subcontractor for NeoTech Solutions, Inc. ("NeoTech"), the incumbent supplier of system design and development, project planning, enterprise architecture, and program administration functions. Am. Compl. ¶¶ 32–33. Systems Plus avers that NetStar had subcontracted to perform "all or substantially all" of the NeoTech work since 2003. *Id.* Systems Plus maintains that NetStar gained inside knowledge by performing this work and further implies that NetStar took active steps to exclude Systems Plus from opportunities to learn more about those functions. For example, Systems Plus contends that NetStar was specifically charged with "running the ITC's internal daily operations meetings" and that employees of Systems Plus were disinvited from attending these meetings in late 2004. *Id.* ¶ 37. Furthermore, Systems Plus avers that "NetStar had a substantial role in ITC's weekly project management and administrative meetings, as well as Technical Review Board meetings. Systems Plus representatives were never invited to and did not attend any such meetings." *Id.* ¶ 38. Systems Plus maintains that these circumstances put Systems Plus at an informational disadvantage that hurt its ability to submit a competitive technical proposal, *id.* ¶ 87, and would have this court find NetStar's position analogous to that of the disqualified awardee in *Johnson Controls.* Pl.'s Judgment Mem. at 17–19. Additionally, Systems Plus claims that the Contracting Officer violated procurement law and regulation by failing to recognize and then mitigate the alleged OCI. Am. Compl. ¶¶ 90–92.

In response, the government and NetStar contend that NetStar did not unduly benefit from information gathered in its role as incumbent. Def.'s Judgment Mot. at 10–14; Intervenor's Opposition to Plaintiff's Motion

for Judgment on the Administrative Record and Cross–Motion for Judgment on the Administrative Record ("Int.'s Judgment Mot.") at 18–19. The government notes that even though NetStar may have gained some insights by performing planning, architecture, and design work for DOL, the knowledge gained provided no more advantage than that usually enjoyed by an incumbent in a solicitation process. Def.'s Judgement Mot. at 5–6. The government further maintains that the proofs Systems Plus has put forward do not specify any detailed, sensitive information to which NetStar had access and thus *Johnson Controls* is inapposite. *Id.* at 7–9. The government cites the declaration of Mr. Hamid Ouyachi, Acting Director of the Office of Technology Services at DOL, Def.'s Judgment Mot. at 11; AR Tab 22 (Declaration of Ouyachi (Oct. 26, 2005)), who maintains that NetStar was never given "any inside information, or any information that would give it an unfair advantage over any other company." AR Tab 22 ¶ 7. With regard to whether Systems Plus employees were deliberately excluded from meetings with DOL's staff, Mr. Ouyachi states that while some meetings did take place in which NetStar was the only contractor present, there were also meetings at which Systems Plus employees were the sole participants. *Id.* ¶ 5. He maintains that participation in contractor meetings was determined by "who [DOL staff] needed to talk to." *Id.*

As further evidence that NetStar did not enjoy an unfair informational advantage over Systems Plus, the government has proffered three Systems Plus information technology contracts with DOL. Def.'s Mot. to Supplement; *see* AR Tab 56 (Contract No. DOLJ059610725), Tab 57 (Task Order DOLB059620732), Tab 58 (Contract No. DOLJ059610724). The government claims that these contracts demonstrate that "Systems Plus performed many of the same kinds of design, development, testing, consultation, and analysis" as NetStar, and therefore indicate that Systems Plus was privy to essentially the same information as NetStar during the solicitation process. Def.'s Mot. to Supplement, at 1.

Even if the averments of the Mr. Ouyachi are discounted as a *post hoc* rationalization and any possible informational advantage that Systems Plus may have gained through its prior work with DOL are similarly discounted, the court determines that Systems Plus has failed to point to evidence that would show that NetStar was "embedded" within the agency such that NetStar had the kind of specific non-public information that would create an OCI. *See Johnson Controls*, 2001 WL 122352, at *5. NetStar, as an incumbent supplier of planning and architecture services, may have had an advantage over some other bidders in these areas. However, it appears not to have had the kind of specific, sensitive information that would create an OCI. In this regard, the court notes that Sytel, an outside contractor that had done little or no prior work with DOL, submitted a technical proposal that was the highest-rated in DOL's initial review of all of the proposals. *See supra*, at 761–62. Additionally, while NetStar's initial technical proposal appears to have provided well-rated initial responses in the area of network architecture, NetStar's original proposal was rated as "weak" in project management because it was "more theoretical than practical." AR Tab 13 (Technical Review Team evaluation of (initial) proposal submitted by NetStar). If NetStar had enjoyed unfair access to non-public information, one would have expected NetStar to have achieved better results in the initial technical appraisal, and better overall technical ratings than a non-incumbent vendor. The court thus finds that NetStar did not benefit from an "unequal access to information" OCI.

■■■ In addition to its "unequal access to information" claim, Systems Plus also implies that NetStar was the beneficiary of "biased ground rules" that resulted from its earlier work with DOL. Systems Plus states that "DOL concedes that NetStar assisted [ ] ITC in designing the very architecture of the computer systems 'to be used by DOL' in the coming years, and that this assistance involved both hardware and software systems and the assembly and integration of those systems.... This concession by itself is enough to present a serious OCI issue." Pl.'s Judgment Mem. at 13 (citing AR Tab 1

(Agency Memorandum of Law) at 7 & n. 3). "Biased ground rules" constitutes the second category of OCI discussed in the *Aetna Health Plans* case:

> The second group consists of situations in which a firm, as part of its performance of a government contract, has in some sense set the ground rules for another government contract by, for example, writing the statement of work or the specifications. In these "biased ground rules" cases, the primary concern is that the firm could skew the competition, whether intentionally or not, in favor of itself. FAR §§ 9.505–1, 9.505–2. These situations may also involve a concern that the firm, by virtue of its special knowledge of the agency's future requirements, would have an unfair advantage in the competition for those requirements.

*Matter of Aetna Gov't Health Plans, Inc.,* 1995 WL 449806, at *8. There is no evidence, however, that NetStar was involved in setting the specifications for the solicitation or writing the solicitation itself. The scant, *post hoc* evidence on this point suggests that "the [DOL] ITC staff prepares its own specifications and solicitations, and [ ] perform[s] [its] own evaluations of vendor quotes and proposals." AR Tab 22 (Decl. of Ouyachi) ¶ 6. Mr. Ouyachi stated that although NetStar helped DOL with the design of its systems architecture, including proposals regarding the types of hardware and software DOL should purchase, *id.* ¶ 9, DOL would not have discussed its procurement plans with contractors or potential vendors. *Id.* ¶ 6. Even discounting these proffered observations, the court concludes that there is no record evidence to show that this solicitation involved "biased ground rules." Therefore, the challenge by Systems Plus to DOL's procurement decision based on OCI is unavailing.

### 2. DOL's evaluation of Systems Plus's proposal.

██ Systems Plus avers that the Contracting Officer's evaluation of price was "improper, irrational, and unlawful." Pl.'s Judgment Mem. at 21. Systems Plus's primary contentions are that DOL evaluated the price proposals in a manner inconsistent with the RFQ, *id.* at 21–26, and that DOL considered price in a manner that did not provide a meaningful evaluation of the actual cost of each proposal to DOL. *Id.* at 26–28.

Systems Plus claims that the solicitation as amended advised prospective bidders "that DOL would evaluate price based solely on the offerors' proposed firm fixed price for the Sample Task Order." Pl.'s Judgment Mem. at 22. Bidders were required to submit a pricing proposal based upon the Sample Task Order provided in the solicitation as a firm-fixed-price requirement; *i.e.,* bidders had to explain the total cost of providing the desired tasks described in the Sample Task Order. *See supra,* at 760–61. However, the solicitation indicated that the "Response to Firm–Fixed–Price Task Order" was to be one of the Evaluation Criteria to be used when evaluating proposals. AR Tab 5 (Solicitation) III.1, 3; *see also* AR Tab 7 (Vendor Request for Clarifications) at 5, 18–19, 29. The solicitation did not, therefore, specify that price would be evaluated *solely* based on the firm-fixed-price associated with the Sample Task Order. To the contrary, the solicitation indicated that "pricing is also required for each labor category in Section 2, paragraph 7" of the solicitation. AR Tab 7 (Vendor Requests for Clarifications) at 6. The solicitation further stated that "[r]ates and prices are evaluated in comparison with other contracts of similar size and nature of the requirement, as well as, in comparison with other offerors." *Id.* at 29. The solicitation provided that the procurement was being conducted as a "best value" procurement and that the solicitation was not required to rate the relative importance of the different evaluation criteria in advance of bidders' submissions of their proposals. *Id.* at 25. Accordingly, the solicitation did not bind the Contracting Officer to make his evaluation of price based upon the firm-fixed-price quote for the Sample Task Order, nor did it require that his evaluation of price focus on any particular combination of the firm-fixed-price quote and the labor-rate measure.

██ Although the Contracting Officer was allowed by the terms of the solicitation to rely upon the hourly labor rates in addition to the firm-fixed-price proposals, he was

required to perform his evaluation of the hourly labor rates in a rational manner; *i.e.*, his analysis could not be arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). As described *supra*, at 761–62, the Contracting Officer calculated a simple, non-weighted arithmetic mean of all hourly labor rates to derive an average hourly rate for each bidder. The Contracting Officer provides no explanation of why this methodology provided a reasonable measure for comparing the bidders' pricing. This methodology allowed no consideration for the fact that different labor categories would likely be used at different levels for different projects. For example, if a vendor was to supply DOL with maintenance and support services for its desktop personal computers, it is logical to assume that technicians would work significantly more hours than supervisory or management personnel. The Contracting Officer's analysis completely ignored these basic realities. The court finds that the Contracting Officer's use of this methodology to the exclusion of other pricing considerations was not rational and therefore finds that the Contracting Officer's price evaluation was arbitrary within the meaning of 5 U.S.C. § 706(2)(A). *See Impresa Construzioni*, 238 F.3d at 1332.

### D. Alleged Prejudice to Systems Plus

The error in the Contracting Officer's evaluation of the bidders' price proposals is only a starting point for the ultimate determination that a reviewing court must make in a bid protest. " '[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.' " *Galen Med. Assocs.*, 369 F.3d at 1330 (quoting *Data Gen. Corp.*, 78 F.3d at 1562). When the procurement is designated as a "best value" procurement, a disappointed bidder has a relatively heavy burden to show that its position in the procurement was prejudiced. Where a "contract was to be awarded based on 'best value,' the contracting officer ha[s] even greater discretion than if the contract were to have been awarded on the basis of cost alone." *Galen Med. Assocs.*, 369 F.3d at 1330 (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996) ("Procure-

ment officials have substantial discretion to determine which proposal represents the best value for the government.")). " 'Where an evaluation is challenged, [the court] will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.' " *Galen Med. Assoc.*, 369 F.3d at 1330 (quoting *E.W. Bliss Co.*, 77 F.3d at 449).

The court finds that there was no prejudice to Systems Plus's position in this best-value procurement. The solicitation did not, and was not required to, rate the relative importance of the different evaluation criteria. Accordingly, the Contracting Officer had broad discretion to determine how important each of the criteria would be in the evaluation. In his best-value determination, the Contracting Officer indicated that there was no particular "weight" assigned to the evaluation factors: "As ... competing offeror proposals in the Technical areas become more equal in rating, the more important Price will become." AR Tab 16 (Determination of Best Value) at 1. The Contracting Officer stated that "[f]rom a business point of view, the value of [NetStar's] quote response (non-cost factors) *supercedes* [sic] *any variances for interpreting the ranking of offerors for price.*" *Id.* at 5 (emphasis added). It thus appears that the Contracting Officer determined that NetStar's proposal was sufficiently superior to other offerors' proposals that NetStar should be selected regardless of which measure of price was evaluated. The Contracting Officer was not required to choose the lowest-price proposal, and therefore his decision that NetStar offered the best value regardless of the manner in which price was measured will not be deemed arbitrary, capricious, or otherwise not in accordance with law pursuant to 5 U.S.C. § 706(2)(A). *See Impresa Construzioni*, 238 F.3d at 1332.

The court thus finds that Systems Plus's position in the procurement was not prejudiced by the Contracting Officer's error in evaluating the pricing in the bidders' proposals. Simply put, Systems Plus would not

have been awarded the BPA even if the Contracting Officer had used the pricing analysis advocated by the plaintiff.

## CONCLUSION

For the reasons stated, the court vacates and sets aside the DOL Contracting Officer's Determination & Findings dated December 9, 2005, disqualifying Systems Plus from competing in any corrected competition that might be ordered in this case. That disqualification decision was arbitrary, capricious, and contrary to law. The court GRANTS Systems Plus's motion for judgment on this issue and correspondingly DENIES the government's and NetStar's motions to dismiss.

In other respects, however, the court concludes that the errors identified in DOL's procurement did not prejudice Systems Plus's position in the procurement. Systems Plus's motion for judgment upon the administrative record of the procurement is accordingly DENIED. The government's and NetStar's cross-motions for judgment upon the administrative record regarding the procurement are GRANTED.

The Clerk is directed to enter judgment for plaintiff insofar as the Contracting Officer's disqualification decision is concerned. The judgment shall provide that the Contracting Officer's Determination & Findings dated December 9, 2005, are vacated and set aside. As to the procurement, the Clerk is directed to enter judgment for defendant and intervening defendant. The award of a BPA to NetStar shall not be disturbed. No costs.[10]

Because this decision might have contained "confidential or proprietary information" within the meaning of RCFC Appendix C, ¶ 4, it was initially issued under seal. The

parties were requested to review the decision and to file proposed redactions on or before February 27, 2006.

IT IS SO ORDERED.

---

10. Procedural motions pending before the court are resolved as follows: (1) Intervenor NetStar's motion to supplement the administrative record with the Contracting Officer's Determination & Findings is GRANTED IN PART. The court has considered the Contracting Officer's disqualification decision for jurisdictional purposes. (2) The government's motion to supplement the administrative record with three documents containing pre-bidding information is GRANTED. (3) System Plus's motions to supplement the administrative record with a declaration of its president and with materials that relate to the Contracting

Officer's disqualification decision are GRANTED IN PART. The court has considered these documentary materials because they relate to, and are properly considered regarding, prejudice and equitable issues, and the court's jurisdiction.

